## Case No. 14,897.

### UNITED STATES v. CRUIKSHANK et al.

[1 Woods, 308:[1] 13 Am. Law Reg. (N. S.) 630.]

Circuit Court, D. Louisiana.  April Term, 1874.[2]

CIVIL RIGHTS BILL — INDICTMENT FOR VIOLATION —FOURTEENTH AND FIFTEENTH AMENDMENTS TO CONSTITUTION — RIGHT TO VOTE — INJURIES TO NEGROES—HOW COGNIZABLE.

1. An indictment, under the enforcement act or civil rights bill, for violating civil rights, should state that the offense charged was committed against the person injured by reason of his race, color or previous condition of servitude.

2. A charge that the defendants conspired to injure certain persons of African descent, being citizens of the United States, thereby to prevent them from exercising their rights as citizens, such as the right to peaceably assemble, to bear arms, etc., unless accompanied with an averment that the injury was committed by reason of the race, color, or previous condition of servitude of the person conspired against, is not sustainable in the courts of the United States.

3. Congress has power to legislate for the enforcement of any right granted by the constitution; but the power must be exercised according to the nature of the grant or guaranty. If it only be that congress or the legislature of a state shall not pass laws for abridging the right, it is a guaranty against acts of the government only, state or federal, and not against the acts of individuals; and in such case congress has not power to legislate over the subject generally; but only to provide remedies or redress in case the legislature or congress itself (as the case may be) should violate the prohibition. The fourteenth amendment of the constitution does not change the power of congress in this respect.

[Cited in Le Grand v. U. S., 12 Fed. 580; U. S. v. Harris, 106 U. S. 638, 1 Sup. Ct. 608; Logan v. U. S., 12 Sup. Ct. 624; Green v. Elbert, 11 C. C. A. 207, 63 Fed. 309.]

4. The thirteenth amendment confers upon congress full power to legislate on the subject of

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]
[2] [Affirmed in 92 U. S. 542.]

slavery, and to pass all laws it may deem proper for its entire eradication in every form. The civil rights act of 1866 was within this power. [Cited in Le Grand v. U. S., 12 Fed. 581.]

5. That act was intended to give to the colored race the rights of citizenship, and to protect them, as a race, or class, from unfriendly state legislation and from lawless combinations. An injury to a colored person, therefore, is not cognizable by the United States courts under that act, unless inflicted by reason of his race, color or previous condition of servitude. An ordinary crime against a colored person, without having that characteristic, is cognizable only in the state courts.

6. The fifteenth amendment does not confer upon congress the power to regulate the right to vote generally; but only to provide against discrimination on account of race, color or previous condition of servitude. Congress, therefore, cannot legislate in reference to any interference with the right to vote, which does not proceed from that cause, unless in elections of senators or representatives. A conspiracy to prevent a colored person from voting is no more a United States offense than a conspiracy to prevent a white person from voting, unless entered into by reason of the voter's race, color or previous condition of servitude.

[Cited in Le Grand v. U. S., 12 Fed. 579; U. S. v. Harris, 106 U. S. 637, 1 Sup. Ct. 607.]

This was an indictment under the enforcement act of May 31, 1870, against [William J. Cruikshank and] nearly one hundred other persons, charging, in the first count, that on the 13th day of April, 1873, at Grant parish, in the state of Louisiana, the defendants unlawfully and feloniously did band together with the unlawful and felonious intent and purpose to injure, oppress, threaten and intimidate one Levi Nelson and one Alexander Tillman, being citizens of the United States of African descent, and persons of color, and in the peace of the state and the United States, with the unlawful and felonious intent thereby to hinder and prevent them in their free exercise and enjoyment of their lawful right and privilege to peaceably assemble together with each other and with other citizens of the United States for a peaceable and lawful purpose, the same being a right and privilege granted or secured to them in common with all other good citizens of the United States, by the constitution and laws of the United States, contrary to the form of the statute, etc. The ninth count repeated the same charge, changing only the words "band together," for the words "conspire together." The seven counts following the first (with the corresponding seven counts following the ninth) charge a conspiracy to injure, oppress, threaten and intimidate the same persons with the intent to prevent and hinder them in the exercise and enjoyment of certain other rights and privileges, namely: in the second count, the right "to keep and bear arms for a lawful purpose;" in the third, with the intent "to deprive them of their lives and liberty of person without due process of law;" in the fourth, the right "to the full and equal benefit of all laws and proceedings enacted by the state or the United States for the security of persons and property, and enjoyed by white citizens;" in the fifth, "the rights, privileges, immunities and protection granted and secured to them as citizens of the United States and of Louisiana, by reason of their race and color, and because they were of African descent, and persons of color;" in the sixth, "the right to vote at any future election, knowing them to be qualified;" in the seventh, "with intent to put them in fear of bodily harm, injure and oppress them, because they had voted at a previous election held in November, 1872;" in the eighth, "every, each, all and singular the several rights and privileges granted or secured to them in common with all good citizens of the United States." The last sixteen counts charged the murder of the same persons in executing the conspiracy. Three of the defendants being convicted on the first sixteen counts of conspiracy only, motion was made in arrest of judgment, and argued by

R. H. Marr, E. John Ellis, W. R. Whitaker, and Mr. Bryan, for defendants.

J. R. Beckwith, U. S. Atty., for the United States.

The judges not being agreed, BRADLEY, Circuit Justice, delivered the following opinion in favor of the motion, which was granted accordingly, and the case was certified to the supreme court:

The indictment in this case is founded on the 6th and 7th sections of the act of congress approved May 31, 1870, entitled "An act to enforce the rights of citizens of the United States to vote in the several states of this Union, and for other purposes." 16 Stat. 140. It contains two distinct series of counts, in one of which the defendants are charged with having unlawfully and feloniously banded or conspired together to intimidate certain persons of African descent (specified by name), and thereby to hinder and prevent them in, and deprive them of, the free exercise and enjoyment of certain supposed constitutional rights and privileges, respectively specified in the several counts of the indictment, such as, in one count, the right peaceably to assemble themselves together; in another, the right to keep and bear arms; in a third, the right to be protected against deprivation of life, liberty and property without due process of law; in a fourth, the right to the full and equal benefit of the laws; in another, the right to vote, etc. The second series or counts charges murder in addition to, and whilst carrying out, the conspiracies charged. Three of the defendants, Cruikshank, Hadnot and Irwin, have been convicted of conspiracy under the first series of counts, which are founded on the sixth section of the act, and now move in arrest of judgment, on the ground that the act is unconstitutional, and that the indictment does not charge any crime under it.

The main ground of objection is that the act is municipal in its character, operating di-

rectly on the conduct of individuals, and taking the place of ordinary state legislation; and that there is no constitutional authority for such an act, inasmuch as the state laws furnish adequate remedy for the alleged wrongs committed.

It cannot, of course, be denied that express power is given to congress to enforce by appropriate legislation the 13th, 14th and 15th amendments of the constitution, but it is insisted that this act does not pursue the appropriate mode of doing this. A brief examination of its provisions is necessary more fully to understand the form in which the questions arise. The first section provides that all citizens of the United States, otherwise qualified, shall be allowed to vote at all elections in any state, county, city, township, etc., without distinction of race, color or previous condition of servitude, any constitution, law, custom or usage of any state or territory to the contrary notwithstanding. This is not quite the converse of the 15th amendment. That amendment does not establish the right of any citizens to vote: it merely declares that race, color or previous condition of servitude shall not exclude them. This is an important distinction, and has a decided bearing on the questions at issue. The second section requires that equal opportunity shall be given to all citizens, without distinction of race, color or previous condition of servitude, to perform any act required as a prerequisite or qualification for voting, and makes it a penal offense for officers and others to refuse or omit to give such equal opportunity. The third section makes the offer to perform such preparatory act, if not performed by reason of such wrongful act or omission of the officers or others, equivalent to performance; and makes it the duty of inspectors or judges of election, on affidavit of such offer being made, to receive the party's vote; and makes it a penal offense to refuse to do so. These three sections relate to the right secured by the 15th amendment. The fourth section makes it a penal offense for any person, by force, bribery, threats, etc., to hinder or prevent, or to conspire with others to hinder or prevent, any citizen from performing any preparatory act requisite to qualify him to vote, or from voting, at any election. This section does not seem to be based on the 15th amendment, nor to relate to the specific right secured thereby. It extends far beyond the scope of the amendment, as will more fully appear hereafter. The fifth section makes it a penal offense for any person to prevent or attempt to prevent, hinder or intimidate any person from exercising the right of suffrage, to whom it is secured by the 15th amendment, by means of bribery, threats, or threats of depriving of occupation, or of ejecting from lands or tenements, or of refusing to renew a lease, or of violence to such person or his family. The sixth section, under which the first sixteen counts of the indictment are framed, contains two distinct clauses. The first declares that "if two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another with intent (to violate any provision of this act), such persons shall be held guilty of felony." Of course this would include conspiracy to prevent any person from voting, or from performing any preparatory act requisite thereto. The next clause has a larger scope. Repeating the introductory and concluding words, it is as follows: "If two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another with intent to injure, oppress, threaten, or intimidate any citizen, with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the constitution or laws of the United States, or because of his having exercised the same, such persons shall be held guilty of felony." Here it is made penal to enter into a conspiracy to injure or intimidate any citizen, with intent to prevent or hinder his exercise and enjoyment, not merely of the right to vote, but of any right or privilege granted or secured to him by the constitution or laws of the United States.

The question is at once suggested, under what clause of the constitution does the power to enact such a law arise? It is undoubtedly a sound proposition, that whenever a right is guarantied by the constitution of the United States, congress has the power to provide for its enforcement, either by implication arising from the correlative duty of government to protect, wherever a right to the citizen is conferred, or under the general power (contained in article 1, § 8, par. 18) "to make all laws necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or any department or officer thereof." It was on the principle first stated that the fugitive slave law was sustained by the supreme court of the United States. Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539. The constitution guarantied the rendition of fugitives held to labor or service in any state, and it was held that congress had, by implication, the power to enforce the guaranty by legislation. "They require," says Justice Story, delivering the opinion of the majority of the court, "the aid of legislation to protect the right, to enforce the delivery, and to secure the subsequent possession of the slave. If, indeed, the constitution guaranties the right, and if it requires the delivery upon the claim of the owner (as cannot well be doubted), the natural inference certainly is, that the national government is clothed with the appropriate authority and functions to enforce it. The fundamental principle applicable to all cases of this sort would seem to be, that where the end is required, the means are given; and, where the duty is

enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is entrusted. The clause is found in the national constitution and not in that of any state. It does not point out any state functionaries, or any state action to carry its provisions into effect. The state, therefore, cannot be compelled to enforce them, etc. The natural if not the necessary conclusion is, that the national government, in the absence of all positive provisions to the contrary, is bound, through its own departments, legislative, judicial, or executive, as the case may require, to carry into effect all the rights and duties imposed upon it by the constitution." To the objection that the power did not fall within the scope of the enumerated powers of legislation confided to congress, Justice Story answers: "Stripped of its artificial and technical structure, the argument comes to this, that. although rights are exclusively secured by, or duties are exclusively imposed upon, the national government, yet, unless the power to enforce these rights or to execute these duties can be found among the express powers of legislation enumerated in the constitution, they remain without any means of giving them effect by any act of congress, and they must operate solely proprio vigore, however defective may be their operation; nay, even although in a practical sense, they may become a nullity from the want of a proper remedy to enforce them, or to provide against their violation. If this be the true interpretation of the constitution, it must, in a great measure, fail to attain many of its avowed and positive objects as a security of rights and a recognition of duties. Such a limited construction of the constitution has never yet been adopted as correct. either in theory or practice." [Prigg v. Pennsylvania] 16 Pet. [41 U. S.] 618.

It seems to be firmly established by the unanimous opinion of the judges in the above quoted case that congress has power to enforce, by appropriate legislation, every right and privilege given or guarantied by the constitution. The method of enforcement, or the legislation appropriate to that end, will depend upon the character of the right conferred. It may be by the establishment of regulations for attaining the object of the right. the imposition of penalties for its violation or the institution of judicial procedure for its vindication when assailed. or when ignored by the state courts: or it may be by all of these together. One method of enforcement may be applicable to one fundamental right, and not applicable to another. With regard to those acknowledged rights and privileges of the citizen, which form a part of his political inheritance derived from the mother country, and which were challenged and vindicated by centuries of stubborn resistance to arbitrary power. they belong to him as his birthright, and it is the duty of the particular state of which he is

a citizen to protect and enforce them, and to do naught to deprive him of their full enjoyment. When any of these rights and privileges are secured in the constitution of the United States only by a declaration that the state or the United States shall not violate or abridge them, it is at once understood that they are not created or conferred by the constitution, but that the constitution only guaranties that they shall not be impaired by the state, or the United States, as the case may be. The fulfillment of this guaranty by the United States is the only duty with which that government is charged. The affirmative enforcement of the rights and privileges themselves, unless something more is expressed, does not devolve upon it. but belongs to the state government as a part of its residuary sovereignty. For example, when it is declared that no state shall deprive any person of life, liberty, or property without due process of law, this declaration is not intended as a guaranty against the commission of murder, false imprisonment, robbery, or any other crime committed by individual malefactors, so as to give congress the power to pass laws for the punishment of such crimes in the several states generally. It is a constitutional security against arbitrary and unjust legislation by which a man may be proceeded against in a summary manner and arbitrarily arrested. and condemned. without the benefit of those time-honored forms of proceeding in open court and trial by jury, which is the clear right of every freeman, both in the parent country and in this. It is a guaranty of protection against the acts of the state government itself. It is a guaranty against the exertion of arbitrary and tyrannical power on the part of the government and legislature of the state, not a guaranty against the commission of individual offenses; and the power of congress, whether implied or expressed, to legislate for the enforcement of such a guaranty, does not extend to the passage of laws for the suppression of ordinary crime within the states. This would be to clothe congress with power to pass laws for the general preservation of social order in every state. The enforcement of the guaranty does not require or authorize congress to perform the duty which the guaranty itself supposes it to be the duty of the state to perform, and which it requires the state to perform. The duty and power of enforcement take their inception from the moment that the state fails to comply with the duty enjoined. or violates the prohibition imposed. No state may pass a law impairing the obligation of contracts. Does this authorize congress to pass laws for the general enforcement of contracts in the states? Certainly not. But when the state has passed a law which violates the prohibition, congress may provide a remedy. It did so in the twenty-fifth section of the judiciary act [1 Stat. 85] by authorizing an appeal to the supreme court of

the United States of all cases where a constitutional or federal right should be denied or overruled in a state court.

Again, "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." But this does not authorize congress to pass a general system of municipal law for the security of person and property, to have effect in the several states for the protection of citizens of other states to whom the fundamental right is guarantied. It only authorizes appropriate and efficient remedies to be provided in case the guaranty is violated. Where affirmative legislation is required to give the citizen the right guarantied, congress may undoubtedly adopt it, as was done in the case of the fugitive slave law and as has been done in later times, to carry into full effect the 13th amendment of the constitution by the passage of the civil rights bill, as will be more fully noted hereafter. But with regard to mere constitutional prohibitions of state interference with established or acknowledged privileges and immunities, the appropriate legislation to enforce such prohibitions is that which may be necessary or proper for furnishing suitable redress when such prohibitions are disregarded or violated. Where no violation is attempted, the interference of congress would be officious, unnecessary, and inappropriate.

The bearing of these observations on the effect of the several recent amendments of the constitution, in conferring legislative powers upon congress, is next to be noticed. The 13th amendment declares that neither slavery nor involuntary servitude, except as a punishment for crime, shall exist within the United States or any place subject to its jurisdiction, and that congress shall have power to enforce this article by appropriate legislation. This is not merely a prohibition against the passage or enforcement of any law inflicting or establishing slavery or involuntary servitude, but it is a positive declaration that slavery shall not exist. It prohibits the thing. In the enforcement of this article, therefore, congress has to deal with the subject matter. If an amendment had been adopted that polygamy should not exist within the United States, and a similar power to enforce it had been given as in the case of slavery, congress would certainly have had the power to legislate for the suppression and punishment of polygamy. So, undoubtedly, by the 13th amendment congress has power to legislate for the entire eradication of slavery in the United States. This amendment had an affirmative operation the moment it was adopted. It enfranchised four millions of slaves, if, indeed, they had not previously been enfranchised by the operation of the Civil War. Congress, therefore, acquired the power not only to legislate for the eradication of slavery, but the power to give full effect to this bestowment of liberty on these millions of people. All this it

essayed to do by the civil rights bill, passed April 9, 1866 (14 Stat. 27), by which it was declared that all persons born in the United States, and not subject to a foreign power (except Indians, not taxed), should be citizens of the United States; and that such citizens, of every race and color, without any regard to any previous condition of slavery or involuntary servitude, should have the same right in every state and territory to make and enforce contracts, to sue be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and should be subject to like punishment, pains and penalties, and to none other, any law, etc., to the contrary notwithstanding.

It was supposed that the eradication of slavery and involuntary servitude of every form and description required that the slave should be made a citizen and placed on an entire equality before the law with the white citizen, and, therefore, that congress had the power, under the amendment, to declare and effectuate these objects. The form of doing this, by extending the right of citizenship and equality before the law to persons of every race and color (except Indians not taxed and, of course, excepting the white race, whose privileges were adopted as the standard), although it embraced many persons, free colored people and others, who were already citizens in several of the states, was necessary for the purpose of settling a point which had been raised by eminent authority, that none but the white race were entitled to the rights of citizenship in this country. As disability to be a citizen and enjoy equal rights was deemed one form or badge of servitude, it was supposed that congress had the power, under the amendment, to settle this point of doubt, and place the other races on the same plane of privilege as that occupied by the white race.

Conceding this to be true (which I think it is), congress then had the right to go further and to enforce its declaration by passing laws for the prosecution and punishment of those who should deprive, or attempt to deprive, any person of the rights thus conferred upon him. Without having this power, congress could not enforce the amendment. It cannot be doubted, therefore, that congress had the power to make it a penal offense to conspire to deprive a person of, or to hinder him in, the exercise and enjoyment of the rights and privileges conferred by the 13th amendment and the laws thus passed in pursuance thereof. But this power does not authorize congress to pass laws for the punishment of ordinary crimes and offenses against persons of the colored race or any other race. That belongs to the state government alone. All ordinary murders, robberies, assaults, thefts, and offenses whatsoever are cognizable only in the state courts, unless, indeed, the state should deny

to the class of persons referred to the equal protection of the laws. Then, of course, congress could provide remedies for their security and protection. But, in ordinary cases, where the laws of the state are not obnoxious to the provisions of the amendment, the duty of congress in the creation and punishment of offenses is limited to those offenses which aim at the deprivation of the colored citizen's enjoyment and exercise of his rights of citizenship and of equal protection of the laws because of his race, color, or previous condition of servitude. To illustrate: If in a community or neighborhood composed principally of whites, a citizen of African descent, or of the Indian race, not within the exception of the amendment, should propose to lease and cultivate a farm, and a combination should be formed to expel him and prevent him from the accomplishment of his purpose on account of his race or color, it cannot be doubted that this would be a case within the power of congress to remedy and redress. It would be a case of interference with that person's exercise of his equal rights as a citizen because of his race. But if that person should be injured in his person or property by any wrongdoer for the mere felonious or wrongful purpose of malice, revenge, hatred, or gain, without any design to interfere with his rights of citizenship or equality before the laws, as being a person of a different race and color from the white race, it would be an ordinary crime, punishable by the state laws only. To constitute an offense, therefore, of which congress and the courts of the United States have a right to take cognizance under this amendment, there must be a design to injure a person, or deprive him of his equal right of enjoying the protection of the laws, by reason of his race, color, or previous condition of servitude. Otherwise it is a case exclusively within the jurisdiction of the state and its courts.

I will next consider the effect of the 15th amendment, to enforce which the law under consideration was primarily framed. The amendment declares that "the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color, or previous condition of servitude," and power is given to congress to enforce the amendment by appropriate legislation. Although negative in form, and therefore, at first view, apparently to be governed by the rule that congress has no duty to perform until the state has violated its provisions, nevertheless in substance, it confers a positive right which did not exist before. The language is peculiar. It is composed of two negatives. The right shall not be denied. That is, the right shall be enjoyed; the right, namely, to be exempt from the disability of race, color, or previous condition of servitude, as respects the right to vote. In terms it has a general application to all, but the history of the events out of which the amendment grew shows that it was principally intended to confer upon colored citizens the right of suffrage. The majority of the court in the recent Slaughterhouse Cases, 16 Wall. [83 U. S.] 81, say: "In the light of the history of these amendments, and the pervading purpose of them, which we have already discussed, it is not difficult to give a meaning to this clause." (Speaking of that clause in the 14th amendment which prohibits the states from denying to any person within its jurisdiction, the equal protection of the laws.) "The existence of laws in the states where the newly emancipated negroes existed, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden. * * * We doubt very much whether any action of a state not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision." Whether this suggestion of the court, that the recent amendments were intended for the benefit of the African race alone, be accepted or not, it is manifest that the 15th amendment was primarily and principally intended for their benefit, and that it does have the affirmative effect before stated of conferring upon them an equal right to vote with that enjoyed by white citizens. It was, in fact, a constitutional extension of the civil rights bill passed in 1866, conferring upon the emancipated slave (as well as all persons of his race) another specific right in addition to those enumerated in that bill; and it is to be interpreted on the same general principles. But whilst the amendment has the effect adverted to, it must be remembered that the right conferred and guarantied is not an absolute, but a relative one. It does not confer the right to vote. That is the prerogative of the state laws. It only confers a right not to be excluded from voting by reason of race, color or previous condition of servitude, and this is all the right that congress can enforce. It confers upon citizens of the African race the same right to vote as white citizens possess. It makes them equal. This is the whole scope of the amendment. The powers of congress, therefore, are confined within this scope. The amendment does not confer upon congress any power to regulate elections or the right of voting where it did not have that power before, except in the particular matter specified. It does, however, confer upon congress the right of enforcing the prohibition imposed against excluding citizens of the United States on account of race, color, or previous condition of servitude. Before the amendment congress had the power to regulate elections and the right of voting in the District of Columbia and in the territories, and to regulate (by altering any regulations made by the state) the time, place and manner of holding elections for senators and representatives in the several states. It has that power still, subject to the prohibition of the amendment. Also, be-

fore the amendment, the states had the power to regulate all state elections and the right of voting therein. They have that power still, subject to the prohibition of the amendment and the right of congress to enforce it. Congress has not acquired any additional right to regulate the latter elections, or the right of voting therein, which it did not possess before, except the power to enforce the prohibition imposed on the states, and the equal right acquired by all races and colors to vote.

The manner in which the prohibition (or the equal right to vote) may be enforced is, of course, the question of principal interest in this inquiry. When the right of citizens of the United States to vote is denied or abridged by a state on account of their race, color, or previous condition of servitude, either by withholding the right itself or the remedies which are given to other citizens to enforce it, then, undoubtedly, congress has the power to pass laws to directly enforce the right and punish individuals for its violation, because that would be the only appropriate and efficient mode of enforcing the amendment. Congress cannot, with any propriety, or to any good purpose, pass laws forbidding the state legislature to deny or abridge the right, nor declaring void any state legislation adopted for that end. The prohibition is already in the constitutional amendment, and laws in violation of it are absolutely void by virtue of that prohibition. So far as relates to rendering null and void the obnoxious law, it is done already; but that does not help the person entitled to vote. By the supposition the state law gives him no remedy and no redress. It is clear, therefore, that the only practical way in which congress can enforce the amendment is by itself giving a remedy and giving redress. If the party should be sued in the state court for attempting to exercise his right, of course the appeal to the supreme court of the United States, given by the twenty-fifth section of the judiciary act, would be all the remedy he would need; but it would be entirely inefficient in securing to him the actual exercise of his right to vote.

But suppose that the laws of the state are in harmony with the amendment, at least contain nothing repugnant thereto; has congress the power to pass laws concurrently with the state to enforce the right of every race and color, without regard to the previous condition of servitude, to an equality in the right to vote? There is no essential incongruity in the coexistence of concurrent laws, state and federal, for the punishment of the same unlawful acts as offenses both against the laws of the state and the laws of the United States. Robbery of the mails, counterfeiting the coin, assaults upon a United States marshal or other officer while in the performance of his duty, and many other cases of like nature, will readily suggest themselves. Moore v. Illinois, 14 How. [55 U. S.] 20. Mr. Justice Grier, in delivering the opinion of the supreme court in the case cited, says: "Every citizen of the United States is also a citizen of a state or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both. Thus, upon the marshal of the United States, and hindering him in the execution of legal process, is a high offense against the United States, for which the perpetrator is liable to punishment; and the same act may be also a gross breach of the peace of the state, a riot, assault, or a murder, and subject the same person to a punishment, under the state laws, for a misdemeanor or felony. That either or both may (if they see fit) punish such an offender cannot be doubted."

The real difficulty in the present case is to determine whether the amendment has given to congress any power to legislate except to furnish redress in cases where the states violate the amendment. Considering, as before intimated, that the amendment, notwithstanding its negative form, substantially guaranties the equal right to vote to citizens of every race and color. I am inclined to the opinion that congress has the power to secure that right not only as against the unfriendly operation of state laws, but against outrage, violence, and combinations on the part of individuals, irrespective of the state laws. Such was the opinion of congress itself in passing the law at a time when many of its members were the same who had consulted upon the original form of the amendment in proposing it to the states. And as such a construction of the amendment is admissible, and the question is one at least of grave doubt, it would be assuming a great deal for this court to decide the law, to the extent indicated, unconstitutional. But the limitations which are prescribed by the amendment must not be lost sight of. It is not the right to vote which is guarantied to all citizens. Congress cannot interfere with the regulation of that right by the states except to prevent by appropriate legislation any distinction as to race, color, or previous condition of servitude. The state may establish any other conditions and discriminations it pleases, whether as to age, sex, property, education, or anything else. Congress, so far as the 15th amendment is concerned, is limited to the one subject of discrimination—on account of race, color or previous condition of servitude. It can regulate us to nothing else. No interference with a person's right to vote, unless made on account of his race, color or previous condition of servitude. is subject to congressional animadversion. There may be a conspiracy to prevent persons from voting having no reference to this discrimination. It may include whites as well as blacks, or may be confined altogether to the latter. It may have reference to the particular politics of the parties. All such conspiracies are amenable to the state laws alone. To bring them within the scope of the amendment and of the powers of congress they must have for mo-

·tive the race, color or previous condition of ·servitude of the party whose right is assailed.

According to my view the law on the subject may be generalized in the following proposition: The war of race, whether it assumes the dimensions of civil strife or domestic violence, whether carried on in a guerrilla or predatory form, or by private combinations, or even by private outrage or intimidation, is subject to the jurisdiction of the government of the United States; and when any atrocity is committed which may be assigned to this ·cause it may be punished by the laws and in the courts of the United States; but any outrages, atrocities, or conspiracies, whether against the colored race or the white race, which do not flow from this cause, but spring from the ordinary felonious or criminal intent ·which prompts to such unlawful acts, are not within the jurisdiction of the United States, ·but within the sole jurisdiction of the states, unless, indeed, the state, by its laws, denies to any particular race equality of rights, in ·which case the government of the United States may furnish remedy and redress to the fullest extent and in the most direct manner. Unless this distinction be made we are driven to one of two extremes—either that congress can never interfere where the state laws are unobjectionable, however remiss the state authorties may be in executing them, and however much a proscribed race may be oppressed; or that congress may pass an entire body of municipal law for the protection of person and property within the states, to operate concurrently with the state laws, for the protection and benefit of a particular class of the community. This fundamental principle, I think, applies to both the 13th and 15th amendments.

After what has been said, a few observations will suffice as to the effect of the 14th amendment, upon the questions under consideration. It is claimed that, by this amendment. congress is empowered to pass laws for directly enforcing all privileges and immunities of citizens of the United States by original proceedings in the courts of the United States, because it provides, amongst other things, that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, and because it gives congress power to enforce its provisions by appropriate legislation. If the power to enforce the amendment were equivalent to the power to legislate generally on the subject matter of the privileges and immunities referred to, this would be a legitimate conclusion. But, as before intimated, that subject matter may consist of rights and privileges not derived from the grants of the constitution, but from those inherited privileges which belong to every citizen, as his birthright, or from that body of natural rights which are recognized and regarded as sacred in all free governments; and the only manner in which the constitution recognizes them may be in a prohibition against the government of the United States, or the state governments, interfering

with them. It is obvious, therefore, that the· manner of enforcing the provisions of this amendment will depend upon the character of the privilege or immunity in question. If simply prohibitory of governmental action. there will be nothing to enforce until such action is undertaken. How can a prohibition,. in the nature of things, be enforced until it is· violated? Laws may be passed in advance to· meet the contingency of a violation, but they can have no application until it occurs. On. the other hand. when the provision is violated: by the passage of an obnoxious law, such law is clearly void, and all acts done under it will be trespasses. The legislation required from congress, therefore, is such as will provide a preventive or compensatory remedy or due punishment for such trespasses; and appeals from the state courts to the United States. courts in cases that come up for adjudication. If these views are correct, there can be no constitutional legislation of congress for directly enforcing the privileges and immunities of citizens of the United States by original proceedings in the courts of the United States, where the only constitutional guaranty of such privileges and immunities is, that no state shall. pass any law to abridge them, and where the state has passed no laws adverse to them,. but, on the contrary, has passed laws to sustain and enforce them.

I will now proceed to examine the several. counts in the indictment, and endeavor to test their validity by the principles which have been laid down. These have been so fully enunciated and explained, that a very brief examination of the counts will suffice.

The first count is for a conspiracy to interfere with the right "to peaceably assemble together with each other, and with other citizens, for a peaceable and lawful purpose." This right is guarantied in the first amendment to the constitution, which declares that "congress shall make no law abridging the right of the people peaceably to assemble and to petition the government for a redress of grievances." Does this disaffirmance of the power of congress to prevent the assembling of the people amount to an affirmative power to punish individuals for disturbing assemblies? This would be a strange inference. That is the prerogative of the states. It belongs to the preservation of the public peace and the fundamental rights of the people. The people of the states do not ask congress to protect the right, but demand that it shall not interfere with it. Has anything since occurred to give congress legislative power over the subject matter? The 14th amendment declares that no state shall by law abridge the privileges or immunities of citizens of the United States. Grant that this prohibition now prevents the states from interfering with the right to assemble, as being one of such privileges and immunities, still, does it give congress power to legislate over the subject? Power to enforce the amendment is all that

is given to congress. If the amendment is not violated, it has no power over the subject.

The second count, which is for a conspiracy to interfere with certain citizens in their right to bear arms, is open to the same criticism as the first.

The third count charges a conspiracy to deprive certain citizens of African descent of their lives and liberties without due process of law. Every murderer and robber does this. Congress surely is not vested with power to legislate for the suppression and punishment of all murders, robberies, and assaults committed within the states. In none of these counts is there any averment that the state had, by its laws, interfered with any of the rights referred to, or that it had attempted to deprive the citizens of life, liberty, or property without due process of law, or that it did not afford to all the equal protection of the laws. The third count cannot be sustained.

The fourth count charges a conspiracy to deprive certain colored citizens of African descent, of the free exercise and enjoyment of the right and privilege to the full and equal benefit of all laws and proceedings for the security of persons and property which is enjoyed by the white citizens. The right and privilege to interfere with the exercise of which is here alleged to have been the object of the conspiracy is not contained in the constitution in express terms. The 14th amendment, amongst other things, declares that no state shall deny to any person within its jurisdiction the equal protection of the laws. But the indictment does not allege that this has been done. The count manifestly refers to the rights secured by the civil rights bill of April 9, 1866, which has already been referred to. That act, as we have seen, expressly declares that all citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, shall have the same right in every state and territory to make and enforce contracts, etc., and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens. The conspiracy charged in the fourth count is a conspiracy to interfere with the free exercise and enjoyment of this right. But the count does not contain any allegation that the defendants committed the acts complained of with a design to deprive the injured persons of their rights on account of their race, color or previous condition of servitude. This, as we have seen, is an essential ingredient in the crime to bring it within the cognizance of the United States authorities. Perhaps such a design may be inferred from the allegation that the persons injured were of the African race, and that the intent was to deprive them of the exercise and enjoyment of the rights enjoyed by white citizens. But it ought not to have been left to inference;

it should have been alleged. On this ground, therefore, I think this count is defective and cannot be sustained.

It is also defective on account of the vagueness and generality of the charge—"to prevent and hinder (them) in the free exercise and enjoyment of their several and respective right and privilege to the full and equal benefit of all laws and proceedings then and there enacted," etc. It seems to me that such a general and sweeping charge, without any specification of any laws or proceedings, does not amount to the averment of a criminal act. It is not merely informal, it is insufficient.

The fifth and eighth counts are open to the same objection of vagueness and generality as the fourth, and for that reason neither of them can, in my judgment, be sustained.

The sixth count charges a conspiracy to prevent and hinder certain citizens of the United States, who were of African descent and persons of color, in the exercise and enjoyment of their right to vote at any election to be thereafter held in the state of Louisiana, or in the parish of Grant, knowing they had such right to vote. A conspiracy to hinder a person from exercising his right to vote at any election is made indictable by the fourth section of the enforcement act; also by the sixth section, read in connection with the first. Over the general subject of the right to vote in the states, and the regulation of said right, congress, as we have seen, has no power to legislate. The fifteenth amendment relates only to discriminations on account of race, color and previous condition of servitude, and, as we have before shown, is a prohibition against the making of such discriminations. The law on which this count is founded is not confined to cases of discrimination above referred to. It is general and universal in its application. Such a law is not supported by the constitution. The charge contained in the count does not describe a criminal offense known to any valid and constitutional law of the United States. It should, at least, have been shown that the conspiracy was entered into to deprive the injured persons of their right to vote by reason of their race, color or previous condition of servitude. This count I also regard as invalid.

The seventh count charges a conspiracy to injure and oppress certain colored citizens of African descent because, being duly qualified to vote, they had exercised their right to do so, and had voted at the election held in Louisiana, in November, 1872, and at other times. This count is subject to the same objection as the last, and is invalid for the same reason.

The next eight counts on which the verdict was found are literal copies, respectively, of the first eight, so far as relates to the language on which their validity depends. The

same observations apply to them which apply to the first eight.

In my opinion the motion in arrest of judgment must be granted. ·

[NOTE. The order arresting the judgment in conformity with the above opinion of Mr. Justice Bradley was affirmed by the supreme court, where it was carried on writ of error and certificate of division. 92 U. S. 542.]