**ADAMS et al. v. TERRY et al.**

No. 13328.

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1952.

Rehearing Denied Feb. 20, 1952.

E. E. Townes, Edgar E. Townes, Jr. and Clarence I. McFarlane, Houston, Tex., for appellants.

J. Edwin Smith, Houston, Tex., for appellees.

Before HUTCHESON, Chief Judge, and HOLMES and STRUM, Circuit Judges.

HUTCHESON, Chief Judge.

Brought March 16, 1950, as a class action against defendants, sued individually and as members of the Jaybird Party, the suit was for a declaratory judgment as to the

---

12.   See Code of Alabama, 1940, Title 7, sec. 51.

rights of plaintiffs and their class to vote in primaries of the Jaybird Party, scheduled for May 6, and June 3, 1950, and for an injunction protecting those rights.

Grounded on the claim, put forward and sustained in Perry v. Cyphers, 5 Cir., 186 F.2d 608, as to the defendants in that suit: that the defendants in this suit are representatives of a political party operating under, and controlled by, art. 3163, Rev. Civil Statutes of Texas, V.A.T.S. Election Code, art. 231; that they exclude negroes from participating in the primaries conducted by them in the name of the Jaybird Party; and that, in doing so, they acted under color of state law; the case is in sharp focus.

Specifically stated, the claim in this suit was: (1) that the defendants were officers of a political party in Fort Bend County, Texas, commonly known as the Jaybird Party, having no state organization and nominating for county and precinct offices only; (2) that the Texas statutes have made the primaries of political parties, without a state organization and which nominate for county and precinct offices only, an integral part of the procedure of choice of precinct and county officials and representatives; (3) that endorsement in the primaries of the Jaybird Party in effect controls the choice of precinct and county officials by determining, first, the nomination in the primaries of the Democratic party for precinct and county officials, and, next, the election of these nominees in the general election; (4) that for many years the officers of the Jaybird party have, on the sole distinction of race or color, denied the plaintiffs and others like situated the right and privilege of voting in its primaries; (5) that the official governing body of the Jaybird party announced in February, 1950, that members of the negro race would not be allowed to vote in the forthcoming primaries scheduled for May 6, and June 3; and (6) that this action was in violation of the Constitution of the United States, Amendments Fourteen, Sec. 1, and Fifteen, Sec. 1, and of the provisions of the Elective Franchise Statute, 8 U.S.C.A. § 31, and the Civil Rights Statute, 8 U.S.C.A. §§ 43 and 47.

Defendants moved to dismiss on the grounds: (1) that they are not representatives of, they do not know, and have never had anything to do with, the Jaybird party; (2) that they are not officers of a political party existing in Fort Bend County, without a state organization and which nominates for county and precinct offices only, as described and dealt with in art. 3163 of the Revised Civil Statutes of Texas; and (3) that they have never operated nor attempted to operate under, or in compliance or in liaison with, art. 3163 or any other state law governing elections.

For answer they alleged, and it was later in effect stipulated: (1) that they are officers of a private unincorporated organization, the Jaybird Democratic Association of Fort Bend County; (2) that it has never become in anywise related to or connected with the electoral Machinery of the State as a process or part thereof, and it is not, and never has been, an integral part of that machinery; (4) that the persons endorsed by it in its preference primaries are not in any way certified to the Democratic Primary, nor do they run in that primary under any symbol or nomenclature or with any status except that of an individual; (5) that it does from time to time, by the use of a straw ballot having no official meaning or legal sanction, take the opinion of the membership of the association, the qualified white voters of county and precincts as to whom they should endorse; and (6) that it does request such persons as may be endorsed in the balloting, to individually apply for positions on the ballot in the official primary, the July primary of the Democratic party, but it has no power to compel them to comply with the request, and they make their application and appearance on the Democratic primary ballot after complying with all of the requirements of the Democratic party for a place thereon as individuals under no symbol or nomenclature whatever indicating that they are members of, or endorsed by, the association.

The case coming to trial, and there being no dispute as to the facts, plaintiffs put in evidence a lengthy and complete stipulation as to the facts and also put two of the de-

fendants on the stand not to contradict, but to confirm, the matters stipulated.

Plaintiffs having rested, the defendants offered one witness, not to contradict, but to confirm and elaborate upon, the stipulation offered by plaintiffs, and a stipulation offered by defendants. This latter contained a statement: (1) as to the conditions in the county which brought about the organization in 1889 of the association; (2) that for a period it had determined the preference of its members at mass meetings, and "later the method was changed to a ballot voting system paralleling in general form and intent the system set up by state law for political party government"; and (3) that, with the announcement of the selection of the candidate preferred by the association, its connection ceased, and the news of the results of the voting was spread by word of mouth, newspapers, etc.

The district judge found: that the main and primary purpose of the organization is to enable the white voters of Fort Bend County to select and elect the county and precinct officers of Fort Bend County and to deny the negro voters any voice or part therein; and that, though the association does not conform to a single requirement of Art. 3163, it is a political party coming clearly within the terms of that article. Of the opinion that the case was ruled by the South Carolina cases, Rice v. Elmore, 4 Cir., 165 F.2d 387 and Baskin v. Brown, 4 Cir., 174 F.2d 391, and by his opinion in White v. County Democratic Executive Committee, D.C., 60 F.2d 973, he gave a judgment for plaintiffs, declaring that they "and all others similarly situated are legally entitled to vote in the Jaybird primary or primaries held by the Jaybird Democratic Association of Fort Bend County, and specifically those primaries to be held" May 6, 1950, and June 3, 1950. Because, however, plaintiffs had waived their claims for dam-

ages and because he thought that, for the reasons given in his opinion, the defendants were not in a position to control the association, no judgment either for damages or an injunction was ordered.

Defendants are here insisting that in so ruling and adjudging, the district court erred, in that he mistakenly applied to the undisputed facts of this case, principles applied in decisions dealing with entirely different facts and situations. They point out that the election dealt with here is not one of the steps in "a two step election machinery for that state",[1] as was the case in the cases the district judge relied on, and, as was the case in Perry v. Cyphers, supra, where nominations for county and for precinct officers were made by a party operating under, and controlled by, Art. 3163. So pointing, appellants insist that the decision in this case is a complete departure from, indeed is in direct contravention of, not only the above cited cases, but of the settled course of decision culminating in Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253, that it was not against individual, but against state, action that the Fourteenth and Fifteenth Amendments and 8 U.S.C.A. §§ 43 and 47 were, and are, directed.

We agree with defendants, and shall briefly set forth our reasons for doing so.

The opinion[2] of the district judge sets out in full the history and purpose of the association, as it is contained in the stipulation offered by defendants, and undertakes, though with undue meagerness and with the result of not making clear what the real facts as stipulated are, to abstract the lengthy stipulation of facts offered by plaintiff. Because this is so, because the facts are undisputed, and because the question at issue is one not of fact but of law, we shall not, except by quoting from the stipulation the controlling facts[3] as to

---

1. Rice v. Elmore, 165 F.2d at page 392.

2. Terry v. Adams, D.C., 90 F.Supp. 595.

3. "By the phrase 'official primary' as used in this stipulation, is meant the Democratic Party primary elections held the fourth Saturday in July and the fourth Saturday in August, as provided in Arti-

cle 3102 Texas R.C.S. [V.A.T.S. Election Code, art. 181]."

"The Jaybird Democratic Association primaries are held in May and June, and are now scheduled for May 6, and June 3, 1950."

"There is no political organization in Fort Bend County, Texas, by the official

what the association does and does not do and briefly summarizing others which are important, further set out the contents of the lengthy stipulation generally or in detail.

Because the principle controlling this case has already been clearly stated and correctly applied in the cases cited by the district judge and in our case of Perry v. Cyphers, supra, it will not be necessary for us to extend this opinion by an elaborate discussion of that principle. It will be sufficient, by brief quotations from some of those cases and by a precise focusing on the facts, which differentiate this case from those, to show that in the decision below a clear and good principle has been misapplied and thereby run into the ground.

█ This principle is that no form of device, through the use of which negroes are, because they are negroes, prevented from voting *at an election, which is in effect a part and parcel of state election machinery,* may be effectively employed. All such forms will be penetrated and the illegal devices will be exposed and stricken down. In Rice v. Elmore, 165 F.2d at page 392, the controlling facts are precisely stated thus: "The use of the Democratic

name or designation 'Jaybird Party'. At all times since 1889, however, there has been and still is, an organization in Fort Bend County, Texas, by the name of 'Jaybird Democratic Association of Fort Bend County, Texas'. Said Association, however, has not since 1938, and it does not: (a) Have a State organization; (b) Follow or attempt to comply with any of the provisions of Article 3163 of the Revised Statutes of Texas, or of any other statutes of the State of Texas with reference to primary elections or general elections; (c) Hold any convention of 'primary election' on the legal primary election day, to-wit: The fourth Saturday in July or the fourth Saturday in August, of any year; (d) Hold any primary convention in any precinct on the Saturday preceding a legal primary election day; (e) By the chairman of a county committee, or otherwise, certify to the County Clerk of Fort Bend County, Texas, or to the County Judge thereof, or to any official committee or other representative of the Democratic or Republican party, any nominations or indorsements made by the Association; (f) Have, or cause to be, printed in a separate column headed by the Association name any nominations of any official ballot used, or for use in, a primary or general election held on a legal primary election day or general election day; (nor does the name, Jaybird Democratic Association of Fort Bend County, Texas, or any part of indication thereof, appear on any ballot in any election other than the primaries, or other special voting occasions, held by the Association itself and alone); (g) Make, or cause to be made, a written application to the County Judge for such printing, signed and sworn to by 3 percent of the entire vote cast in Fort Bend County at the last preceding general election."

Early in each year in which elections are to be held the Executive Committee of the Jaybird Democratic Association meets and sets the dates (a) by which persons who desire their names on the Jaybird Democratic Association primary ballot must file applications therefor; (b) the date by which the fees to be paid by each such person toward the expense of the Jaybird Democratic Association primary shall be paid; such fees being usually fixed at between 2 and 3 percent of the salaries of the offices aspired to; (c) the date on which the Jaybird Democratic Association primary shall be held in May; and (d) the date on which the Jaybird Democratic Association runoff primary, if required, will be held in June

The ballots from each voting precinct are canvassed by the Executive Committee which declares the results of such canvass and announces the identity of the persons who have received the indorsement. No officer nor committee of such association certified the result of the vote or any nominations of the association to the County Clerk of Fort Bend County, to the Democratic County Executive Committee, nor to the committee or official of any party of a statewide organization.

No person who receives the indorsement of the Jaybird association is compelled to run in the Democratic primary, but if he wishes to run he may do so. But he must himself file his application with the Executive chairman or committee of the Democratic party, must independently comply with the requirements of the Democratic party or the law, and must himself pay the fee as provided by law. Neither the Jaybird Association nor anybody for it applies to the Democratic party for the placing of its nominee on the ballot for the Democratic party election.

primary in connection with the general election in South Carolina provides, as has been stated, a two step election machinery for that state; and the denial to the Negro of the right to participate in the primary denies him all effective voice in the government of his country."

In Baskin v. Brown, supra, which follows the principle applied in Rice's case and quotes freely from it, Judge Parker, who had for the court written the opinion in Rice's case, summing up the Rice decision, said 174 F.2d at page 393: The gist of that decision was that primaries, under modern conditions, are a part of the election machinery of the state, and that a state cannot, by allowing a political party to take over this part of its election machinery, avoid the provisions of the Constitution forbidding racial discrimination in elections, * * * and thus deny to a part of the electorate, because of race or color, any effective voice in the government of the state.

Further, 174 F.2d at page 394, in canvassing and rejecting the argument made there, that the Democratic party in South Carolina does not exercise state power but is a mere voluntary organization of citizens to which the constitutional limitations upon the power of the state have no application, Judge Parker, for the court, makes an illuminating contribution to the discussion and application of the principle: *"This may be true of a political party which does not undertake the performance of state functions, but not of one which is allowed by the state to take over and operate a vital part of its electoral machinery. When the organization of the party and the primary*

*which it conducts are so used in connection with the general election that the latter merely registers and gives effect to the discrimination which they have sanctioned, such discrimination must be enjoined to safeguard the election itself from giving effect to that which the Constitution forbids.* Courts of equity are neither blind nor impotent. They exercise their injunctive power to strike directly at the source of the evil which they are seeking to prevent. The evil here is racial discrimination which bars Negro voters from any effective participation in the government of their state; *and when it appears that this discrimination is practiced through rules of a party which controls the primary elections, these must be enjoined just as any other practice which threatens to corrupt elections or divert them from their constitutional purpose."* (Emphasis supplied.)

In Perry's case, supra, the party was an integral part of the state election machinery. It operated precisely under, and in accordance with, art. 3163 of the Revised Civil Statutes. As a matter of course, we there determined, in conformity with the controlling principle and with prior decisions on the subject, that the action of the party was state action and that negroes could not be deprived of participation in its elections.

Here, as a comparison, point by point, of the provisions of Article 3163,[4] with the stipulated facts set out in note 3, supra, will show, the Jaybird Democratic Association does not in any way or manner operate as a part or parcel of, or in liaison with, state political or elective machinery. In short, it is not a part of the two step

---

4. "Art. 3163. Parties without State organization.

"Any political party without a State organization desiring to nominate candidates for county and precinct offices only may nominate such candidates therefor under the provisions of this title by primary elections or by a county convention held on the legal primary election day, which convention shall be composed of delegates from various election precincts in said county, elected therein at primary conventions held in such precincts between the hours of 8:00 a. m. and 10:00 p. m. of the preceding Saturday. All nominations made by any such parties shall be certified to the county clerk by the chairman of the county committee of such party, and, after taking the same course as nominations of other parties so certified, shall be printed on the official ballot in a separate column, headed by the name of the party; provided, a written application for such printing shall have been made to the county judge, signed and sworn to by three per cent (3%) of the entire vote cast in such county at the last general election." V.A.T.S. Election Code, art. 231.

arrangement, the Democratic primary and the general election, so as to make its action state action.

It is true that in the main, though there have been, and are, exceptions, the indorsement of the Jaybird primary does usually mean that the winner of that indorsement will have no opposition in the Democratic primary. *This is not, however, because of any provision of state law or any agreement or arrangement with the Democratic party having the effect of state action. It is because, and only because there is a consensus of opinion in the country that the indorsement should be regarded as decisive.*

No claim is made, or could be made, that anybody, including any of the plaintiffs, is misled, by collusion of state authorities, or of managers, or officers of the State Democratic Party, with these defendants, into believing that the advisory vote taken by the white voters of Fort Bend County has any legal or binding effect whatever. Indeed, while the form and pattern of an election has been followed, nothing more in substance has occurred here than if, in precinct by precinct, neighborhood by neighborhood, or by straw ballot in a newspaper, the white voters of Fort Bend County had indicated their choice for the offices to be filled and had made that choice publicly known.

If, upon the overall facts, the question for our decision were whether, from the standpoint of good neighborliness and good government in the changed and changing climate of opinion in this state, there is any point in clinging, under the greatly different conditions [5] now prevailing, to this outworn and outmoded shadow boxing, these mock elections, we should be constrained to declare that it seems to us that the white voters of Fort Bend County are vainly holding to the husks of a respected tradition long after the ripe grain has fallen.

But this is not our question. What and all that is for decision here is whether the complained of action is action under color of state law, depriving plaintiffs of rights accorded them by the invoked constitutional and statutory provisions. To answer that question in the affirmative and to hold that it is, would be, we think, to go directly contrary to the long line of cases beginning with the In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, and ending with Collins v. Hardyman, supra [341 U.S. 651, 71 S.Ct. 940.] In that case it was said:

"While we have not been in agreement as to the interpretation and application of some of the post-Civil War legislation, the Court recently unanimously declared, through the Chief Justice:

" 'Since the decision of this Court in the Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that

---

5. Compare the changed conditions and climate of opinion now prevailing, of which we may take judicial notice, with the greatly different conditions and events which existed at the time of the formation of the association, as they are set out in Terry v. Adams, 90 F.Supp. at page 597, and these excerpts from the testimony of Judge D. R. Pearson, an original member of the Association:

"In 1888, there were two tickets placed in the field. One was called the Woodpecker ticket, which consisted of the white people who came from outside and who were controlling the negro vote, and the other was called the Jaybird Party, which consisted of the white people of the county. * * *

"There were assassinations, and fights resulting in killings and great disorders. * * *

"One of the major occasions for limiting the membership of the Association to white people was that the negro vote had been controlled by—I will call them bad white people * * * and we thought that by combining the white people and keeping the bad white people separated from the darkies who were easily led, that we could obtain good government and the exclusion of the negro was merely an accident of our purpose. *The association was not formed, was not directed against the negro, it was directed against the bad white men who were leading astray the darkies. * * * As a matter of fact, prior to 1950, none of our negro friends ever asked to be admitted to membership in the Democratic Jaybird Association."* (Emphasis supplied.)

of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.' "

The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.