## TERRY ET AL. *v.* ADAMS ET AL.

No. 52.   Argued January 16, 1953.—Decided May 4, 1953.

For opinion of MR. JUSTICE BLACK, joined by MR. JUSTICE DOUGLAS and MR. JUSTICE BURTON, see *post*, p. 462.

For opinion of MR. JUSTICE FRANKFURTER, see *post*, p. 470.

For concurring opinion of MR. JUSTICE CLARK, joined by THE CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE JACKSON, see *post*, p. 477.

For dissenting opinion of MR. JUSTICE MINTON, see *post*, p. 484.

*J. Edwin Smith* and *James M. Nabrit* argued the cause for petitioners. With *Mr. Smith* on the brief was *Ira J. Allen*.

*Edgar E. Townes, Jr.* and *Clarence I. McFarlane* argued the cause for respondents. With them on the brief was *E. E. Townes*.

MR. JUSTICE BLACK announced the judgment of the Court and an opinion in which MR. JUSTICE DOUGLAS and MR. JUSTICE BURTON join.

In *Smith* v. *Allwright*, 321 U. S. 649, we held that rules of the Democratic Party of Texas excluding Negroes from voting in the party's primaries violated the Fifteenth Amendment. While no state law directed such exclusion, our decision pointed out that many party activities were subject to considerable statutory control. This case raises questions concerning the constitutional power of a Texas county political organization called the Jaybird Democratic Association or Jaybird Party to exclude Negroes from its primaries on racial grounds. The Jaybirds deny that their racial exclusions violate the

Fifteenth Amendment. They contend that the Amendment applies only to elections or primaries held under state regulation, that their association is not regulated by the state at all, and that it is not a political party but a self-governing voluntary club. The District Court held the Jaybird racial discriminations invalid and entered judgment accordingly. 90 F. Supp. 595. The Court of Appeals reversed, holding that there was no constitutional or congressional bar to the admitted discriminatory exclusion of Negroes because Jaybird's primaries were not to any extent state controlled. 193 F. 2d 600. We granted certiorari. 344 U. S. 883.

There was evidence that:

The Jaybird Association or Party was organized in 1889. Its membership was then and always has been limited to white people; they are automatically members if their names appear on the official list of county voters. It has been run like other political parties with an executive committee named from the county's voting precincts. Expenses of the party are paid by the assessment of candidates for office in its primaries. Candidates for county offices submit their names to the Jaybird Committee in accordance with the normal practice followed by regular political parties all over the country. Advertisements and posters proclaim that these candidates are running subject to the action of the Jaybird primary. While there is no legal compulsion on successful Jaybird candidates to enter Democratic primaries, they have nearly always done so and with few exceptions since 1889 have run and won without opposition in the Democratic primaries and the general elections that followed. Thus the party has been the dominant political group in the county since organization, having endorsed every county-wide official elected since 1889.

It is apparent that Jaybird activities follow a plan purposefully designed to exclude Negroes from voting and

at the same time to escape the Fifteenth Amendment's command that the right of citizens to vote shall neither be denied nor abridged on account of race. These were the admitted party purposes according to the following testimony of the Jaybird's president:

Q. . . . Now Mr. Adams, will you tell me specifically what is the specific purpose of holding these elections and carrying on this organization like you do?

A. Good government.

Q. Now I will ask you to state whether or not it is the opinion and policy of the Association that to carry on good government they must exclude negro citizens?

A. Well, when we started it was and it is still that way, I think.

Q. And then one of the purposes of your organization is for the specific purpose of excluding negroes from voting, isn't it?

A. Yes.

Q. And that is your policy?

A. Yes.

Q. I will ask you, that is the reason you hold your election in May rather than in June or July, isn't it?

A. Yes.

Q. Because if you held it in July you would have to abide by the statutes and the law by letting them vote?

A. They do vote in July.

Q. And if you held yours at that time they would have to vote too, wouldn't they?

A. Why sure.

Q. And you hold it in May so they won't have to?

A. Well, they don't vote in ours but they can vote on anybody in the July election they want to.

Q. But you are not answering my question. My question is that you hold yours in May so you won't have to let them vote, don't you?

A. Yes.

Q. And that is your purpose?

A. Yes.

Q. And your intention?

A. Yes.

Q. And to have a vote of the white population at a time when the negroes can't vote, isn't that right?

A. That's right.

Q. That is the whole policy of your Association?

A. Yes.

Q. And that is its purpose?

A. Yes.

The District Court found that the Jaybird Association was a political organization or party; that the majority of white voters generally abide by the results of its primaries and support in the Democratic primaries the persons endorsed by the Jaybird primaries; and that the chief object of the Association has always been to deny Negroes any voice or part in the election of Fort Bend County officials.

The facts and findings bring this case squarely within the reasoning and holding of the Court of Appeals for the Fourth Circuit in its two recent decisions about excluding Negroes from Democratic primaries in South Carolina. *Rice* v. *Elmore,* 165 F. 2d 387, and *Baskin* v. *Brown,* 174 F. 2d 391.[1] South Carolina had repealed

---

[1] It has been suggested that there is a crucial distinction between this case and the South Carolina primary cases. There, it is said, the names of Democratic nominees were placed on the state's general election ballots as Democratic nominees. Here Jaybird nominees are not put on any ballot as Jaybird nominees; they enter their own names as candidates in the Democratic primary. This distinction is not one of substance but of form, and a statement of this Court

every trace of statutory or constitutional control of the Democratic primaries. It did this in the hope that thereafter the Democratic Party or Democratic "Clubs" of South Carolina would be free to continue discriminatory practices against Negroes as voters. The contention there was that the Democratic "Clubs" were mere private groups; the contention here is that the Jaybird Association is a mere private group. The Court of Appeals in invalidating the South Carolina practices answered these formalistic arguments by holding that no election machinery could be sustained if its purpose or effect was to deny Negroes on account of their race an effective voice in the governmental affairs of their country, state, or community. In doing so the Court relied on the principle announced in *Smith* v. *Allwright, supra,* at 664, that the constitutional right to be free from racial discrimination in voting ". . . is not to be nullified by a State through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election."

The South Carolina cases are in accord with the commands of the Fifteenth Amendment and the laws passed pursuant to it. That Amendment provides as follows:

> "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

in *Smith* v. *Allwright, supra,* at 661, seems appropriate: *"Such a variation in the result from so slight a change in form* influences us to consider anew the legal validity of the distinction which has resulted in barring Negroes from participating in the nominations of candidates of the Democratic party in Texas." (Emphasis supplied.) The same may be said about the attempted distinction between the "two-step" exclusion process in South Carolina and the "three-step" exclusion process in Texas.

The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy, obviously applicable to the right of Negroes not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local. Shortly after its adoption Mr. Chief Justice Waite speaking for this Court said:

> "It follows that the amendment has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude." *United States* v. *Reese,* 92 U. S. 214, 218.

Other cases have reemphasized the Fifteenth Amendment's specific grant of this new constitutional right.[2] Not content to rest congressional power to protect this new constitutional right on the necessary and proper

---

[2] "In *United States* v. *Reese et al., supra,* p. 214, we hold that the fifteenth amendment has invested the citizens of the United States with a new constitutional right, which is, exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude. From this it appears that the right of suffrage is not a necessary attribute of national citizenship; but that exemption from discrimination in the exercise of that right on account of race, &c., is. The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States; but the last has been." *United States* v. *Cruikshank,* 92 U. S. 542, 555–556. To the same effect, see *Ex parte Yarbrough,* 110 U. S. 651, 664–665; *Logan* v. *United States,* 144 U. S. 263, 286. The Amendment has been held "self-executing." See *Guinn* v. *United States,* 238 U. S. 347, 362–363.

clause of the Constitution, the Fifteenth Amendment's framers added § 2, reading:

> "The Congress shall have power to enforce this article by appropriate legislation."

And Mr. Justice Miller speaking for this Court declared that the Amendment's granted right to be free from racial discrimination ". . . should be kept free and pure by congressional enactments whenever that is necessary." *Ex parte Yarbrough,* 110 U. S. 651, 665. See also *United States* v. *Reese, supra,* at 218. And see Mr. Justice Bradley's opinion on circuit in *United States* v. *Cruikshank,* 1 Woods 308, 314–316, 320–323. Acting pursuant to the power granted by the second section of the Fifteenth Amendment, Congress in 1870 provided as follows:

> "All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." 8 U. S. C. § 31.

The Amendment, the congressional enactment and the cases make explicit the rule against racial discrimination in the conduct of elections. Together they show the meaning of "elections." Clearly the Amendment includes any election in which public issues are decided or public officials selected.[3] Just as clearly the Amendment

---

[3] "We may mystify any thing. But if we take a plain view of the words of the Constitution, and give to them a fair and obvious interpretation, we cannot fail in most cases of coming to a clear understanding of its meaning. We shall not have far to seek. We shall find it on the surface, and not in the profound depths of speculation." *Ex parte Siebold,* 100 U. S. 371, 393.

excludes social or business clubs. And the statute shows the congressional mandate against discrimination whether the voting on public issues and officials is conducted in community, state or nation. Size is not a standard.

It is significant that precisely the same qualifications as those prescribed by Texas entitling electors to vote at county-operated primaries are adopted as the sole qualifications entitling electors to vote at the county-wide Jaybird primaries with a single proviso—Negroes are excluded. Everyone concedes that such a proviso in the county-operated primaries would be unconstitutional. The Jaybird Party thus brings into being and holds precisely the kind of election that the Fifteenth Amendment seeks to prevent. When it produces the equivalent of the prohibited election, the damage has been done.

For a state to permit such a duplication of its election processes is to permit a flagrant abuse of those processes to defeat the purposes of the Fifteenth Amendment. The use of the county-operated primary to ratify the result of the prohibited election merely compounds the offense. It violates the Fifteenth Amendment for a state, by such circumvention, to permit within its borders the use of any device that produces an equivalent of the prohibited election.

The only election that has counted in this Texas county for more than fifty years has been that held by the Jaybirds from which Negroes were excluded. The Democratic primary and the general election have become no more than the perfunctory ratifiers of the choice that has already been made in Jaybird elections from which Negroes have been excluded. It is immaterial that the state does not control that part of this elective process which it leaves for the Jaybirds to manage. The Jaybird primary has become an integral part, indeed the only effective part, of the elective process that determines who shall rule and govern in the county. The effect of the whole

procedure, Jaybird primary plus Democratic primary plus general election, is to do precisely that which the Fifteenth Amendment forbids—strip Negroes of every vestige of influence in selecting the officials who control the local county matters that intimately touch the daily lives of citizens.

We reverse the Court of Appeals' judgment reversing that of the District Court. We affirm the District Court's holding that the combined Jaybird-Democratic-general election machinery has deprived these petitioners of their right to vote on account of their race and color. The case is remanded to the District Court to enter such orders and decrees as are necessary and proper under the jurisdiction it has retained under 28 U. S. C. § 2202. In exercising this jurisdiction, the Court is left free to hold hearings to consider and determine what provisions are essential to afford Negro citizens of Fort Bend County full protection from future discriminatory Jaybird-Democratic-general election practices which deprive citizens of voting rights because of their color.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER.

Petitioners are Negroes who claim that they and all Negroes similarly situated in Fort Bend County, Texas, are denied all voice in the primary elections for county offices by the activities of respondent association, the Jaybird Democratic Association. The Jaybird Association was organized in 1889 and from that time until the present has selected, first in mass meetings but for some time by ballot of its members, persons whom the organization indorses for election in the Democratic primary for county office. The Association has never permitted Negroes to participate in its selection of the candidates to be indorsed; balloting is open only to all white citizens

of the county qualified under State law to vote. The District Court granted a declaratory judgment that Negroes in the county be allowed to participate in the balloting of the Association. The Court of Appeals reversed, saying that although the white voters in the county are "vainly holding" to "outworn and outmoded" practices, the action of the Association was not "action under color of state law" and therefore not in violation of federal law.

The evidence, summarized by formal stipulation, shows that all rules of the Association are made by its members themselves or by its Executive Committee. Membership, defined by the rules of the Association, consists of the entire white voting population as shown in poll lists prepared by the county. The time of balloting, in what are called the Jaybird primaries, is set by the Executive Committee of the Association for a day early in May of each election year. The expenses of these primaries, the officiating personnel, the balloting places, the determination of the winner—all aspects of these primaries are exclusively controlled by the Association. The balloting rules in general follow those prescribed by the State laws regulating primaries. See Vernon's Tex. Stat., 1948 (Rev. Civ. Stat.), Tit. 50, c. 13, now revised, 9 Vernon's Tex. Civ. Stat., 1952, c. 13. But formal State action, either by way of legislative recognition or official authorization, is wholly wanting.

The successful candidates in the Jaybird primaries, in formal compliance with State rules in that regard, file individually as candidates in the Democratic primary held on the fourth Saturday in July. No mention is made in the filing or in the listing of the candidates on the Democratic primary ballot that they are the Jaybird indorsees. That fact is conveyed to the public by word of mouth, through newspapers, and by other private means. There is no restriction on filing by anyone else

as a candidate in the Democratic primary, nor on voting by Negroes in that official primary.

For the sixty years of the Association's existence, the candidate ultimately successful in the Democratic primary for every county-wide office was the man indorsed by the Jaybird Association. Indeed, other candidates almost never file in the Democratic primary. This continuous success over such a period of time has been the result of action by practically the entire qualified electorate of the county, barring Negroes.

This case is for me by no means free of difficulty. Whenever the law draws a line between permissive and forbidden conduct cases are bound to arise which are not obviously on one side or the other. These dubious situations disclose the limited utility of the figure of speech, a "line," in the law. Drawing a "line" is necessarily exercising a judgment, however confined the conscientious judgment may be within the bounds of constitutional and statutory provisions, the course of decisions, and the presuppositions of the judicial process. If "line" is in the main a fruitful tool for dividing the sheep from the goats, it must not be forgotten that since the "line" is figurative the place of this or that case in relation to it cannot be ascertained externally but is a matter of the mind.

Close analysis of what it is that the Fifteenth Amendment prohibits must be made before it can be determined what the relevant line is in the situation presented by this case. The Fifteenth Amendment, not the Fourteenth, outlawed discrimination on the basis of race or color with respect to the right to vote. Concretely, of course, it was directed against attempts to bar Negroes from having the same political franchise as white folk. "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of

servitude." U. S. Const., Amend. XV, § 1. The command against such denial or abridgment is directed to the United States and to the individual States. Therefore, violation of this Amendment and the enactments passed in enforcement of it must involve the United States or a State. In this case the conduct that is assailed pertains to the election of local Texas officials. To find a denial or abridgment of the guaranteed voting right to colored citizens of Texas solely because they are colored, one must find that the State has had a hand in it.

The State, in these situations, must mean not private citizens but those clothed with the authority and the influence which official position affords. The application of the prohibition of the Fifteenth Amendment to "any State" is translated by legal jargon to read "State action." This phrase gives rise to a false direction in that it implies some impressive machinery or deliberative conduct normally associated with what orators call a sovereign state. The vital requirement is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme by which colored citizens are denied voting rights merely because they are colored.

As the action of the entire white voting community, the Jaybird primary is as a practical matter the instrument of those few in this small county who are politically active—the officials of the local Democratic party and, we may assume, the elected officials of the county. As a matter of practical politics, those charged by State law with the duty of assuring all eligible voters an opportunity to participate in the selection of candidates at the primary—the county election officials who are normally leaders in their communities—participate by voting in the Jaybird primary. They join the white voting community in proceeding with elaborate formality, in almost all respects parallel to the procedures dictated by Texas

law for the primary itself, to express their preferences in a wholly successful effort to withdraw significance from the State-prescribed primary, to subvert the operation of what is formally the law of the State for primaries in this county.

The legal significance of the Jaybird primary must be tested against the cases which, in an endeavor to screen what is effectively an exertion of State authority in preventing Negroes from exercising their constitutional right of franchise, have pierced the various manifestations of astuteness. In the last of the series, *Smith* v. *Allwright*, 321 U. S. 649, we held that the State regulation there of primaries conducted by a political party made the party "required to follow these legislative directions an agency of the State in so far as it determines the participants in a primary election." *Id.*, at 663. Alternative routes have been suggested for concluding that the Jaybird primary is "so slight a change in form," *id.*, at 661, that the result should not differ in substance from that of *Smith* v. *Allwright*. The District Court found that the Jaybird Association is a political party within the meaning of the Texas legislation regulating the administration of primaries by political parties; it said that the Association could not avoid that result by holding its primary on a different date and by utilizing different methods than those prescribed by the statutes.

Whether the Association is a political party regulated by Texas and thus subject to a duty of nondiscrimination, or is, as it claims, clearly not a party within the meaning of that legislation, failing as it does to attempt to comply with a number of the State requirements, particularly as to the date of the "primary," is a question of State law not to be answered in the first instance by a federal court. We do not know what the Texas Supreme Court would say. An operation such

as the Jaybird primary may be found by the Texas court to satisfy Texas law although it does not come within the formal definition; it may so be found because long-accepted customs and the habits of a people may generate "law" as surely as a formal legislative declaration, and indeed, sometimes even in the face of it. See, e. g., *Nashville, Chattanooga & St. Louis R. Co.* v. *Browning*, 310 U. S. 362, 369. But even if the Jaybird Association is a political party, a federal court cannot say that a political party in Texas is to hold a primary open to all on a day other than that fixed by Texas statute. This would be an inadmissible intervention of the federal judiciary into the political process of a State. If such a remedy is to be derived from a finding that the Jaybird Association is a political party, it is one that must be devised by the Texas courts. For the same reason, we cannot say that the Jaybird primary is a "primary" within the meaning of Texas law and so regulated by Texas law that *Smith* v. *Allwright* would apply.

But assuming, as I think we must, that the Jaybird Association is not a political party holding a State-regulated primary, we should nonetheless decide this case against respondents on the ground that in the precise situation before us the State authority has come into play.

The State of Texas has entered into a comprehensive scheme of regulation of political primaries, including procedures by which election officials shall be chosen. The county election officials are thus clothed with the authority of the State to secure observance of the State's interest in "fair methods and a fair expression" of preferences in the selection of nominees. Cf. *Waples* v. *Marrast*, 108 Tex. 5, 12, 184 S. W. 180, 183. If the Jaybird Association, although not a political party, is a device to defeat the law of Texas regulating primaries, and if the electoral officials, clothed with State power in the county, share in that subversion, they cannot divest themselves of the State au-

thority and help as participants in the scheme. Unlawful administration of a State statute fair on its face may be shown "by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself," *Snowden* v. *Hughes,* 321 U. S. 1, 8; here, the county election officials aid in this subversion of the State's official scheme of which they are trustees, by helping as participants in the scheme.

This is not a case of occasional efforts to mass voting strength. Nor is this a case of boss-control, whether crudely or subtly exercised. Nor is this a case of spontaneous efforts by citizens to influence votes or even continued efforts by a fraction of the electorate in support of good government. This is a case in which county election officials have participated in and condoned a continued effort effectively to exclude Negroes from voting. Though the action of the Association as such may not be proscribed by the Fifteenth Amendment, its role in the entire scheme to subvert the operation of the official primary brings it "within reach of the law. . . . [T]hey are bound together as the parts of a single plan. The plan may make the parts unlawful." Mr. Justice Holmes, speaking for the Court, in *Swift and Company* v. *United States,* 196 U. S. 375, 396.

The State here devised a process for primary elections. The right of all citizens to share in it, and not to be excluded by unconstitutional bars, is emphasized by the fact that in Texas nomination in the Democratic primary is tantamount to election. The exclusion of the Negroes from meaningful participation in the only primary scheme set up by the State was not an accidental, unsought consequence of the exercise of civic rights by voters to make their common viewpoint count. It was the design, the very purpose of this arrangement that the Jaybird primary in May exclude Negro participation in July. That it was the action in part of the election officials charged by

Texas law with the fair administration of the primaries, brings it within the reach of the law. The officials made themselves party to means whereby the machinery with which they are entrusted does not discharge the functions for which it was designed.

It does not follow, however, that the relief granted below was proper. Since the vice of this situation is not that the Jaybird primary itself is the primary discriminatorily conducted under State law but is that the determination there made becomes, in fact, the determination in the Democratic primary by virtue of the participation and acquiescence of State authorities, a federal court cannot require that petitioners be allowed to vote in the Jaybird primary. The evil here is that the State, through the action and abdication of those whom it has clothed with authority, has permitted white voters to go through a procedure which predetermines the legally devised primary. To say that Negroes should be allowed to vote in the Jaybird primary would be to say that the State is under a duty to see to it that Negroes may vote in that primary. We cannot tell the State that it must participate in and regulate this primary; we cannot tell the State what machinery it will use. But a court of equity can free the lawful political agency from the combination that subverts its capacity to function. What must be done is that this county be rid of the means by which the unlawful "usage," R. S. § 2004, 8 U. S. C. § 31, in this case asserts itself.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE, MR. JUSTICE REED, and MR. JUSTICE JACKSON join, concurring.

The issue is whether the Jaybird Democratic Association of Fort Bend County, Texas, by excluding Negroes from its primaries has denied to Negro citizens of the county a right to vote secured by the Fifteenth Amend-

ment. On March 16, 1950, petitioners on behalf of themselves and similarly situated Negro citizens in Fort Bend County instituted a class action against respondents individually and as officers of the Jaybird Democratic Association.[1] The complaint, in substance, charged that the Negro petitioners were duly qualified voters of the State of Texas who for many years and solely because of their race and color had been denied the right to vote in the primaries of the Association, a political party. Contending that these practices transgressed the Constitution and laws of the United States,[2] petitioners sought declaratory and injunctive relief.[3] Respondents insisted

---

[1] See Fed. Rules Civ. Proc. 23.

[2] Petitioners mainly rested their claims on the Fourteenth and Fifteenth Amendments, and 8 U. S. C. § 31.

Article XIV. "SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article XV. "SECTION 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"SECTION 2. The Congress shall have power to enforce this article by appropriate legislation."

8 U. S. C. § 31: "All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

[3] 28 U. S. C. (Supp. V) §§ 1331, 2201. Petitioners abandoned a claim to money damages, apparently grounded on 8 U. S. C. §§ 43, 47.

that the Jaybird Democratic Association was not a political party regulated by Texas statutes but merely a private voluntary group. The District Court held that the Jaybird Democratic Association was a political party, and ruled its discriminatory exclusion of Negroes from the primary invalid.[4] Judgment accordingly entered declared petitioners legally entitled to vote in the Jaybird primary. The District Court refused an injunction but retained jurisdiction to grant further appropriate relief.[5] The Court of Appeals reversed; in

[4] 90 F. Supp. 595 (D. C. S. D. Tex. 1950). The District Judge supported his conclusions by reference to Art. 3163, Vernon's Texas Civil Statutes (1925):

"Art. 3163. Parties without State organization

"Any political party without a State organization desiring to nominate candidates for county and precinct offices only may nominate such candidates therefor under the provisions of this title by primary elections or by a county convention held on the legal primary election day, which convention shall be composed of delegates from various election precincts in said county, elected therein at primary conventions held in such precincts between the hours of eight a. m. and ten p. m. of the preceding Saturday. All nominations made by any such parties shall be certified to the county clerk by the chairman of the county committee of such party, and, after taking the same course as nominations of other parties so certified, shall be printed on the official ballot in a separate column, headed by the name of the party; provided, a written application for such printing shall have been made to the county judge, signed and sworn to by three per cent of the entire vote cast in such county at the last general election." This provision has been substantially recodified as Art. 13.54, Vernon's Texas Election Code (1952).

[5] "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U. S. C. (Supp. V) § 2202.

The District Judge refused injunctive relief because the affairs of the Jaybird Democratic Association are controlled by an Executive Committee of twenty-two persons; the four named defendants before the court had not the power to permit petitioners to vote in the Jaybird balloting.

its view the discriminatory exclusions were not reached by the terms of the Constitution and congressional enactments.[6]

An old pattern in new guise is revealed by the record.[7] The Jaybird Democratic Association of Fort Bend County was founded in 1889 to promote "good government" in the post-Reconstruction period. During its entire life span the Association has restricted membership to whites. In earlier years, the members at mass meetings determined their choice of candidates to support at forthcoming official elections. Subsequently the Association developed a system closely paralleling the structure of the Democratic Party. The Association is governed by an Executive Committee of twenty-two persons, one from each voting precinct in the county. The Committee in each election year sets the date of the Jaybird primary for selecting by ballot the candidates to be endorsed by the Association for public office in the county. The machinery of the Jaybird Democratic Association primary now differs from the state-regulated Democratic Party primary mainly in the Association's prohibition of more than two consecutive terms for officeholders, the absence of a pledge on the ballot at the Jaybird primary, and the Association's practice of not officially filing as a ticket the names of candidates successful in its balloting. And for more than a half century the Association has adhered to its guiding principle: to deny the Negro voters of Fort Bend County any effective voice in their government.

The Court of Appeals, in reversing the District Court, largely relied on what it deemed "the settled course of decision culminating in Collins v. Hardyman, 341 U. S.

---

[6] 193 F. 2d 600 (C. A. 5th Cir. 1952).

[7] Cf. *Nixon* v. *Herndon,* 273 U. S. 536 (1927); *Nixon* v. *Condon,* 286 U. S. 73 (1932); *Smith* v. *Allwright,* 321 U. S. 649 (1944).

651, . . . that it was not against individual, but against state, action that the Fourteenth and Fifteenth Amendments and 8 U. S. C. A. §§ 43 and 47 were, and are, directed." [8]   But *Collins* dealt not with racial discrimination at the ballot box but merely "a lawless political brawl, precipitated by a handful of white citizens against other white citizens." 341 U. S., at 662.   In any event, *Collins* adjudicated that Congress in the narrow class of conspiracies defined by the Civil Rights Statutes had not included the conspiracy charged in that particular complaint; expressly refraining from constitutional questions, *ibid.,* that case cannot be held controlling here.[9]

In our view, the Court of Appeals has misconceived the thrust of our recent decisions.   The Fifteenth Amendment secures the franchise exercised by citizens of the United States against abridgment by any state on the basis of race or color.   In *Smith* v. *Allwright,* 321 U. S. 649 (1944), this Court held that the Democratic Party of itself, and perforce any other political party, is prohibited by that Amendment from conducting a racially discriminatory primary election.   By the rule of that case, any "part of the machinery for choosing officials" becomes subject to the Constitution's restraints.   *Id.,* at 664.   There, as here, we dealt with an organization that took the form of "voluntary association" of unofficial character.   But because in fact it functioned as a part of the state's electoral machinery, we held it controlled

---

[8] 193 F. 2d, at 602.   And see *id.,* at 605.

[9] Since in this case we deem the activities of the Jaybird Democratic Association unlawful under the independent reach of the Fifteenth Amendment, the applicability of 8 U. S. C. § 31 need not be considered now.   See *United States* v. *Reese,* 92 U. S. 214, 218 (1876); *United States* v. *Cruikshank,* 92 U. S. 542, 555–556 (1876).   Cf. *James* v. *Bowman,* 190 U. S. 127 (1903), with *Ex parte Yarbrough,* 110 U. S. 651 (1884), and *Myers* v. *Anderson,* 238 U. S. 368, 379 (1915).

by the same constitutional limitations that ruled the official general election.

We agree with Chief District Judge Kennerly that the Jaybird Democratic Association is a political party [10] whose activities fall within the Fifteenth Amendment's self-executing ban. See *Guinn* v. *United States,* 238 U. S. 347, 363 (1915); *Myers* v. *Anderson,* 238 U. S. 368, 379–380 (1915).[11] Not every private club, association or league organized to influence public candidacies or political action must conform to the Constitution's restrictions on political parties. Certainly a large area of freedom permits peaceable assembly and concerted private action for political purposes to be exercised separately by white and colored citizens alike. More, however, is involved here.

The record discloses that the Jaybird Democratic Association operates as part and parcel of the Democratic Party, an organization existing under the auspices of Texas law.[12] Each maintains the same basic qualification for membership: eligibility to vote under Texas law. Although the state Democratic Party in Texas since *Smith* v. *Allwright, supra,* no longer can restrict its membership to whites, the Jaybird Democratic Association bars Negroes from its ranks. In May of each election year it conducts a full-scale white primary in which each candidate campaigns for his candidacy subject to the action of that primary *and the Democratic primary of July,* linking

---

[10] See *Smith* v. *Allwright,* 321 U. S. 649, 662 (1944); *Nixon* v. *Condon,* 286 U. S. 73, 88–89 (1932). See note 4, *supra.*

[11] See also *Neal* v. *Delaware,* 103 U. S. 370, 389–390 (1881); *Ex parte Yarbrough,* 110 U. S. 651, 665 (1884).

[12] The record in this case comprises not only a concise stipulation of facts, but also 43 additional pages of directly relevant testimony. Obviously the whole of the record underlay the determinations of the courts below, and must be considered in an appellate review of their decisions.

the two primaries together. After gaining the Jaybird Democratic Association's endorsement, the announced winners after full publicity then file in the July Democratic primary. The record reveals that 3,910 eligible voters were listed in Fort Bend County in the presidential year 1944; though only 2,032 participated in the July primary under the Democratic banner, 3,790 members voted in the May balloting of the Jaybird Democratic Association. In 1946, an off-year for presidential balloting, eligible voters numbered 4,460; the Association's May primary polled 3,309 votes, and the Democratic July primary counted but 2,996. And while the lists in 1948, again a presidential year, show only 3,856 eligible electors in the County, the Jaybird primary mustered a total vote of 4,055, compared with 3,108 in the primary voting in July. Significantly, since 1889 the winners of the Jaybird Democratic Association balloting, with but a single exception shown by this record,[13] ran unopposed and invariably won in the Democratic July primary and the subsequent general elections for county-wide office.

Quite evidently the Jaybird Democratic Association operates as an auxiliary of the local Democratic Party organization, selecting its nominees and using its machinery for carrying out an admitted design of destroying the weight and effect of Negro ballots in Fort Bend

---

[13] In 1944, Mr. Charles Schultz emerged victorious from the Jaybird balloting and was indorsed as its candidate for County Judge. In the July Democratic primary, Schultz triumphed by a vote of 2,025 to 1 for Mr. Mike Dornak. Schultz held office for two terms until 1948. In that year, in accord with a Jaybird Association rule prohibiting more than two consecutive terms in office, Mr. Baker received the Jaybird indorsement for the county judgeship. Schultz, however, insisted on running in the Democratic primary; he lost out to Baker by a vote of 2,209 to 803. See R. 34, 79. The record reveals, however, that the Jaybird-indorsed candidates for *precinct* office were not quite as consistently successful.

County. To be sure, the Democratic primary and the general election are nominally open to the colored elector. But his must be an empty vote cast after the real decisions are made. And because the Jaybird-indorsed nominee meets no opposition in the Democratic primary, the Negro minority's vote is nullified at the sole stage of the local political process where the bargaining and interplay of rival political forces would make it count.

The Jaybird Democratic Association device, as a result, strikes to the core of the electoral process in Fort Bend County. Whether viewed as a separate political organization or as an adjunct of the local Democratic Party, the Jaybird Democratic Association is the decisive power in the county's recognized electoral process. Over the years its balloting has emerged as the locus of effective political choice. Consonant with the broad and lofty aims of its Framers, the Fifteenth Amendment, as the Fourteenth, "refers to exertions of state power in all forms." *Shelley* v. *Kraemer,* 334 U. S. 1, 20 (1948). Accordingly, when a state structures its electoral apparatus in a form which devolves upon a political organization the uncontested choice of public officials, that organization itself, in whatever disguise, takes on those attributes of government which draw the Constitution's safeguards into play. *Smith* v. *Allwright, supra,* at 664; cf. *United States* v. *Classic,* 313 U. S. 299, 324 (1941); *Lane* v. *Wilson,* 307 U. S. 268, 275 (1939).

In sum, we believe that the activities of the Jaybird Democratic Association fall within the broad principle laid down in *Smith* v. *Allwright, supra.* For that reason we join the judgment of the Court.

MR. JUSTICE MINTON, dissenting.

I am not concerned in the least as to what happens to the Jaybirds or their unworthy scheme. I am concerned about what this Court says is state action within the

meaning of the Fifteenth Amendment to the Constitution. For, after all, this Court has power to redress a wrong under that Amendment only if the wrong is done by the State. That has been the holding of this Court since the earliest cases. THE CHIEF JUSTICE for a unanimous Court in the recent case of *Shelley* v. *Kraemer*, 334 U. S. 1, 13, stated the law as follows:

> "Since the decision of this Court in the *Civil Rights Cases*, 109 U. S. 3 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. *That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.*" (Emphasis supplied.)*

As I understand MR. JUSTICE BLACK's opinion, he would have this Court redress the wrong even if it was individual action alone. I can understand that praiseworthy position, but it seems to me it is not in accord with the Constitution. State action must be shown.

MR. JUSTICE FRANKFURTER recognizes that it must be state action but he seems to think it is enough to constitute state action if a state official participates in the Jaybird primary. That I cannot follow. For it seems clear to me that everything done by a person who is an official is not done officially and as a representative of the State. However, I find nothing in this record that shows the state or county officials participating in the Jaybird primary.

MR. JUSTICE CLARK seems to recognize that state action must be shown. He finds state action in assumption, not in facts. This record will be searched in vain for

---

*The Fifteenth Amendment as here involved is also directed at state action only.

486

one iota of state action sufficient to support an anemic inference that the Jaybird Association is in any way associated with or forms a part of or cooperates in any manner with the Democratic Party of the County or State, or with the State. It calls itself the Jaybird Democratic Association because its interest is only in the candidates of the Democratic Party in the county, a position understandable in Texas. It is a gratuitous assumption on the part of MR. JUSTICE CLARK that: "Quite evidently the Jaybird Democratic Association operates as an auxiliary of the local Democratic Party organization, selecting its nominees and using its machinery for carrying out an admitted design of destroying the weight and effect of Negro ballots in Fort Bend County." The following stipulation in the record shows the unsubstantiality of that statement just quoted from MR. JUSTICE CLARK's opinion. I quote the stipulation:

"There is no compulsion upon any person who receives the indorsement of the Jaybird Democratic Association of Fort Bend County, Texas, for a particular office, to run for that office or any other office. In the event such indorsee of the Association does desire to run for such office he may do so; but if he does so run for such office he must himself file his application with the Executive Chairman or Committee of the Democratic Party for the position on the Democratic Party ballot for the July primary of such Democratic Party, and must himself pay the fee as provided by law. Neither the Jaybird Democratic Association nor its Executive Committee files an application with the Democratic Party Executive Committee or Chairman that the Jaybird Democratic Association nominee be placed on the ballot for the Democratic Party July primary election.

There is nothing on the ballot of the Democratic Party primary to indicate that any person appearing thereon does or does not have the indorsement of the Jaybird Democratic Association.

"The name of the applicant for a place on the Democratic Party ballot is not placed on said ballot unless he complies with the laws of the State of Texas, even though such applicant were indorsed by the Jaybird Democratic Association; and every qualified applicant who makes the required application to the Democratic Executive Committee and pays the requisite fee is placed on the Democratic Party primary ballot for the July Democratic primary though not indorsed by the Jaybird Democratic Association.

"No member of the Negro race, nor any other person qualified under the laws of the State of Texas to become a candidate, has been refused a place on the Democratic Party primary ballot for Fort Bend County, Texas, by the Democratic Party."

Neither is there any more evidence that the Jaybird Association avails itself of or conforms in any manner to any law of the State of Texas. As to the Jaybird Association's relation to the State, I again quote the stipulation in the record:

"There is no political organization in Fort Bend County, Texas, by the official name or designation 'Jaybird Party'. At all times since 1889, however, there has been and still is, an organization in Fort Bend County, Texas, by the name of 'Jaybird Democratic Association of Fort Bend County, Texas'. Said Association, however, has not since 1938, and it does not: (a) Have a State organization; (b) Follow or attempt to comply with any of the provisions of Article 3163 of the Revised Statutes of Texas, or

of any other statutes of the State of Texas with reference to primary elections or general elections; (c) Hold any convention or 'primary election' on the legal primary election day, to-wit: The fourth Saturday in July or the fourth Saturday in August, of any year; (d) Hold any primary convention in any precinct on the Saturday preceding a legal primary election day; (e) By the chairman of a county committee, or otherwise, certify to the County Clerk of Fort Bend County, Texas, or to the County Judge thereof, or to any official committee or other representative of the Democratic or Republican party, any nominations or indorsements made by the Association; (f) Have, or cause to be, printed in a separate column headed by the Association name any nominations on any official ballot used, or for use in, a primary or general election held on a legal primary election day or general election day; (nor does the name, Jaybird Democratic Association of Fort Bend County, Texas, or any part or indication thereof, appear on any ballot in any election other than the primaries, or other special voting occasions, held by the Association itself and alone); (g) Make, or cause to be made, a written application to the County Judge for such printing, signed and sworn to by 3% of the entire vote cast in Fort Bend County at the last preceding general election.

.  .  .  .  .

"No officer nor Committee of such Association certifies the result of the Association membership vote, nor any nominations of the Association, to the County Clerk of Fort Bend County, Texas, nor to the Democratic Party Executive Committee nor to the Committee or official of any party with a state-wide organization.

.  .  .  .  .

"In the last few years some of the members of the Negro race have offered to vote in the Democratic Party primaries and no member of the Negro race who had qualified under the laws of the State of Texas to vote has been refused the right to vote. Some of the members of the Negro race have offered to vote in a general election in Fort Bend County, Texas, and no member of the Negro race qualified to vote has been refused a vote.

. . . . .

"The Jaybird Democratic Association of Fort Bend County, Texas, is not, and does not have, a state organization, but limits its May and June Association primaries to only the county and precinct offices, except that the membership of the Association does vote its preference for the office of District Clerk in Fort Bend County.

"The persons seeking the indorsement of the Jaybird Democratic Association of Fort Bend County, Texas, at its May or June Primaries are not required by the Association to file any expense account and do not file expense accounts with any State or local official, Committee or Board."

These stipulations from the record show the complete absence of any compliance with the state law or practice, or cooperation by or with the State. Even if it be said to be a political organization, the Jaybird Association avails itself of no state law open to political organizations, such as Art. 3163.

However, its action is not forbidden by the law of the State of Texas. Does such failure of the State to act to prevent individuals from doing what they have the right as individuals to do amount to state action? I venture the opinion it does not.

MR. JUSTICE CLARK's opinion agrees with District Judge Kennerly that this Jaybird Democratic Association is a political party whose activities fall within the Fifteenth Amendment's self-executing ban. In the same paragraph, he admits that not all meetings for political action come under the constitutional ban. Surely white or colored members of any political faith or economic belief may hold caucuses. It is only when the State by action of its legislative bodies or action of some of its officials in their official capacity cooperates with such political party or gives it direction in its activities that the Federal Constitution may come into play. A political organization not using state machinery or depending upon state law to authorize what it does could not be within the ban of the Fifteenth Amendment. As the stipulation quoted shows, the Jaybird Association did not attempt to conform or in any way to comply with the statutes of Texas covering primaries. No action of any legislative or quasi-legislative body or of any state official or agency ever in any manner denied the vote to Negroes, even in the Jaybird primaries.

So it seems to me clear there is no state action, and the Jaybird Democratic Association is in no sense a part of the Democratic Party. If it is a political organization, it has made no attempt to use the State, or the State to use it, to carry on its poll.

*Rice* v. *Elmore,* 165 F. 2d 387, is cited as authority for the position of the petitioners. In that case, South Carolina had repealed all its laws relating to the conduct of primaries. The only primary conducted was by the Democratic Party of South Carolina in accordance with rules adopted by the Party. It was stipulated on the trial of that case that the Democratic Party "conducts nominating primaries and thereafter prints its ballots for use in the General Elections with the names of its nominees

thereon which ballots are distributed by party officials and placed at the General Election precincts in South Carolina for use by any electors who choose to use such ballot in voting in any such General Election in South Carolina." The District Court specifically found in Finding 19: "There is no General Election ballot in South Carolina. The only printed ballots available in General Elections in South Carolina are ballots prepared by the political parties giving only the names of their respective candidates." Finding 14 stated: "During the past 25 years the Democratic Party of South Carolina has been the only political party in South Carolina which has held state-wide primaries for nomination of candidates for Federal and State offices."

Thus it will be seen that there the Democratic Party furnished not only the candidate in the general election, but it also furnished the only ballot one could vote in that election. So the State in the general election accepted the ballot of the Democratic Party as its official ballot, and on that ballot no Negro had been permitted to vote. Clearly, the State adopted the Democratic Party's procedure as its action. The State and the Democratic Party effectively cooperated to carry on this two-step election procedure.

No such action is taken by the Jaybird Association. It neither files, certifies, nor supplies anything for the primary or election. The winner of the poll in the Jaybird Association contest files in the Democratic primary, where he may and sometimes has received opposition, and successful opposition, in precinct contests for County Commissioner, Justice of the Peace and Constable. There is no rule of the Jaybird Association that requires the successful party in its poll to file in the Democratic primary or elsewhere. It is all individual, voluntary action. Neither the State nor the Democratic Party

avails itself of the action of or cooperates in any manner with the Jaybird Association.

*Smith* v. *Allwright,* 321 U. S. 649, is in no manner controlling. In that case, the State had set up the machinery for the Democratic Party to conduct its primary. The State of Texas made the Democratic Party its agent for the conducting of a Democratic primary. Of course, the Democratic Party could not run that primary, set up under the auspices of the State, in a manner to exclude citizens of Texas therefrom because of their race. That such is the basis of the Court's opinion in *Smith* v. *Allwright, supra,* is apparent from the following quotation taken from that case:

"Primary elections are conducted by the party under state statutory authority. The county executive committee selects precinct election officials and the county, district or state executive committees, respectively, canvass the returns. These party committees or the state convention certify the party's candidates to the appropriate officers for inclusion on the official ballot for the general election. No name which has not been so certified may appear upon the ballot for the general election as a candidate of a political party. . . .

"We think that this statutory system for the selection of party nominees for inclusion on the general election ballot makes the party *which is required* to follow these legislative directions an agency of the State in so far as it determines the participants in a primary election. The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party." 321 U. S. 649, 663. (Emphasis supplied.)

This case does not hold that a group of Democrats, white, black, male, female, native-born or foreign, economic royalists or workingmen, may not caucus or conduct a straw vote. What the Jaybird Association did here was to conduct as individuals, separate and apart from the Democratic Party or the State, a straw vote as to who should receive the Association's endorsement for county and precinct offices. It has been successful in seeing that those who receive its endorsement are nominated and elected. That is true of concerted action by any group. In numbers there is strength. In organization there is effectiveness. Often a small minority of stockholders control a corporation. Indeed, it is almost an axiom of corporate management that a small, cohesive group may control, especially in the larger corporations where the holdings are widely diffused.

I do not understand that concerted action of individuals which is successful somehow becomes state action. However, the candidates endorsed by the Jaybird Association have several times been defeated in primaries and elections. Usually but not always since 1938, only the Jaybird-endorsed candidate has been on the Democratic official ballot in the County.

In the instant case, the State of Texas has provided for elections and primaries. This is separate and apart and wholly unrelated to the Jaybird Association's activities. Its activities are confined to one County where a group of citizens have appointed themselves the censors of those who would run for public offices. Apparently so far they have succeeded in convincing the voters of this County in most instances that their supported candidates should win. This seems to differ very little from situations common in many other places far north of the Mason-Dixon line, such as areas where a candidate must obtain the approval of a religious group. In other localities, candidates are carefully selected by both parties to

give proper weight to Jew, Protestant and Catholic, and certain posts are considered the sole possession of certain ethnic groups. The propriety of these practices is something the courts sensibly have left to the good or bad judgment of the electorate. It must be recognized that elections and other public business are influenced by all sorts of pressures from carefully organized groups. We have pressure from labor unions, from the National Association of Manufacturers, from the Silver Shirts, from the National Association for the Advancement of Colored People, from the Ku Klux Klan and others. Far from the activities of these groups being properly labeled as state action, under either the Fourteenth or the Fifteenth Amendment, they are to be considered as attempts to influence or obtain state action.

The courts do not normally pass upon these pressure groups, whether their causes are good or bad, highly successful or only so-so. It is difficult for me to see how this Jaybird Association is anything but such a pressure group. Apparently it is believed in by enough people in Fort Bend County to obtain a majority of the votes for its approved candidates. This differs little from the situation in many parts of the "Bible Belt" where a church stamp of approval or that of the Anti-Saloon League must be put on any candidate who does not want to lose the election.

The State of Texas in its elections and primaries takes no cognizance of this Jaybird Association. The State treats its decisions apparently with the same disdain as it would the approval or condemnation of judicial candidates by a bar association poll of its members.

In this case the majority have found that this pressure group's work does constitute state action. The basis of this conclusion is rather difficult to ascertain. Apparently it derives mainly from a dislike of the goals of the Jaybird Association. I share that dislike. I fail to see how it makes state action. I would affirm.