To: Fourth Court of Appeals

Re: 2016 CR 2492
Re: SA-16-CA-75-RP

Exhibits #1-12

2017 FEB 27 PM 1:05

*Exhibit #1*

Mukmuk v. Commissioner of Dept. of Correctional Services, 529 F 2d 272 (1976)

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

There are types of deprivation of rights which may be recognized as unconstitutional for purposes of federal civil rights statute only when they are judicially so declared; however, there are instances of gross abuse to human dignity so shocking to conscience as to require no judicial pronouncement for their general recognition. 42 U S C A . § 1983; U S C A Const. Amend. 8.

Cases that cite this headnote

[11]    Civil Rights ⟺ Government Agencies and Officers

Public officer may inflict harm which is a violation of a constitutional prohibition without conscious plan or illicit purpose; however, test of liability ought not ignore entirely the mores of the times or even the particular mores of prison guards, untrained in the lawyers' view of life.

1 Cases that cite this headnote

Attorneys and Law Firms

*273 David J. Fine, New York City (Elizabeth M. Fisher, David Rosenberg, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for appellant.

David L. Birch, Deputy Asst. Atty. Gen. of the State of New York (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for appellees.

Before FEINBERG, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

Opinion

GURFEIN, Circuit Judge:

The plaintiff, Masia Mukmuk, is a Black Muslim leader who spent 15 years in New York state prisons.[1] From his own allegations in his civil rights complaint, he was an activist in prison. One cannot help but read between the lines *274 that he has been a thorn in the side of prison officials during most of his prison life. Such activism tends to elicit a reactive use of power. To persons in authority in the prison scene that power is readily available. The serious question raised is whether the boundaries of permissible sanctions by the corrections officers were crossed and the constitutional rights of Mukmuk under the Eighth, Fourteenth and First Amendments violated.

[1]    He was released on parole in January, 1975.

This is a s 1983 action which has long endured upon the docket of the District Court for the Southern District of New York with but little movement. The action was begun in August 1970. The complaint was twice amended. In October 1973, a motion for summary judgment was made by the defendants, who are the Commissioner of the Department of Correctional Services; J. Edwin LaVallee, Superintendent of the Clinton Correctional Facility; Vincent R. Mancusi, Superintendent of the Attica Correctional Facility; and John L. Zelker, Superintendent of the Green Haven Correctional Facility.[2]

[2]    Earlier defense motions to dismiss for lack of prosecution were denied. Various other procedural moves are described in the opinion below. Mukmuk v. Commissioner of Dept of Correctional Services, 369 F Supp. 245 (S D N Y 1974). A prayer for restoration of good time credits was dismissed as in the nature of a petition for habeas corpus without exhaustion of state remedies. See Preiser v. Rodriguez, 411 U S. 475, 93 S Ct. 1827, 36 L Ed 2d 439 (1973). We agree.

Exhibit #3

Epps v. Cortese, 326 F. Supp. 127 (1971)

*130 9. Neither the Replevin With Bond Act nor the rules expressly set forth that the Sheriff, pursuant to the writ with bond, may forcibly break and enter or that he may not break or enter.

10. In none of the individual cases did the Sheriff forcibly break and enter into the premises of plaintiffs.

11. Neither the Sheriff nor his agents have any discretion in determining the underlying transaction giving rise to the replevin with bond action. They are not required or permitted to hear or determine any issues of the rights of either of the parties to the property in question.

12. The Sheriff, or his agents, after seizing and taking possession of the property named in the writ, must hold it in his custody for a period of seventy-two hours, during which time the defendant named on the writ may regain possession of the property by filing a counter-bond in the same amount as the original bond.

13. The form of the writ required by Pennsylvania Rules of Civil Procedure, Rule 1354, contains no notice to the defendant that he may recover the property by posting a counter-bond, nor does it expressly prohibit this notice.

14. If the defendant on the writ fails to file the counter-bond within the seventy-two hour period, the Sheriff, or his agents, is required to deliver the property seized to the plaintiff on the writ, subject to Rule 1079 dealing with impounding.

15. The plaintiff, Epps, and the defendant, Government Employees Exchange Corporation, are the parties to a contract entitled Retail Installment Contract- Security Agreement' which provides, inter alia, the following:

You or assigns shall retain title to said merchandise; I will be responsible for its loss or damage; I will not remove or encumber same; if I default in any payment or breach any covenant herein, the entire balance shall be immediately due and payable and you or assigns may retake the merchandise, sell the same and hold me for any deficiency, or affirm the sale and hold me liable for the unpaid balance * * * Notice by buyer: 1. Do not sign this contract before you read it or if it contains any blank spaces.'

16. The property named in the writ to be replevied from plaintiff Epps consisted of one G E. stereo, two wedding rings, a diamond watch and band and a T V. roof antenna.

17. Plaintiff Epps, at the time of the institution of the replevin action, earned in excess of $10,000 per year.

18. On February 1, 1969, the plaintiff, Paul Parham, and the defendant, Sears, Roebuck and Co., entered into a similar retail credit contract also providing that the seller retain title in the goods sold and that upon default the seller may at his option repossess the goods. The plaintiff, Ellen Parham, was not a party to the contract.

19. A Harmony House table and four stools and a divan bed were delivered to the plaintiff, Paul Parham, and possession was retained by him in his home until the goods were replevied by the Sheriff of Philadelphia County.

20. The agreements entered into by plaintiffs Epps and Parham comply with the provisions of the Uniform Commercial Code of Pennsylvania and the Goods and Services Installment Sales Act.

21. The payment record of the plaintiff, Paul Parham, shows that there were defaults on his part as to the agreement of February 1, 1969.

22. There were nine (9) telephone calls made by the defendant, Sears, or its representatives, to Mr. Parham and five (5) written communications were also sent. The dates on which such written communications were sent are respectively: May 16, 1970, May 22, 1970, June 22, 1970, July 22, 1970, and August 19, 1970. There were also two (2) personal visits to the home of the plaintiff. All of these telephone calls, letters and visits concerned the problem of the account and its status.

*131 23. On September 11, 1970, a Writ of Replevin With Bond was issued by the Prothonotary of Philadelphia County on behalf of the defendant, Sears, Roebuck and Co., upon the filing by it with the Prothonotary of a bond as required



(b) Complete Manual of Criminal Forms, Bailey and Rothblatt.

(c) Criminal Law Reporter, current subscription.

(d) Modern Criminal Procedure, Hall and Kamisar.

(e) Constitutional Rights of Prisoners, Palmer.

(f) Federal Habeas Corpus, Sokol.

(g) You and the Law, Reader's Digest.

(h) Legal Research in a Nutshell, Cohen.

(i) Legal Research, Writing and Analysis, West Publishing Company.

(j) Corrections and Prisoners' Rights, Krantz.

(k) Manual for Prison Law Libraries, Werner.

(l) Modern Federal Practice Digest, Volumes 16–18A, 26, 26A, 39, and 42.

(m) Manual for Courts Martial, U.S. Government Printing Office.

(n) Justice and the Military, Public Law Education Institute (out of print– keep current copies).

(o) Rights of the Imprisoned, Singer.

*611 (p) Practice Manual on Military Discharge Upgrading, American Civil Liberties Union.

(q) Prisoners' Assistance Directory, The National Prison Project.

(r) Criminal Procedure in a Nutshell, Israel and LaFave.


All Citations

790 F.2d 589

End of Document      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

them a main law library. Caldwell does not argue that his access to the basic library is inadequate in terms of the number of visits he is allowed or the amount of time he may remain in the library at any one time.

[25] [26] Caldwell claims that the basic law libraries cannot serve as a substitute for direct access to them a main law library. We do not agree. The basic law libraries, if they contain the materials listed in the appendix to the affidavit filed in support of Miller's motion for summary judgment (reproduced in Appendix to this opinion), are adequate to provide Caldwell with the citations he needs to request caselaw materials and to complete his research. Restrictions on direct access to legal materials may be justified in light of legitimate security considerations. Campbell, at 226–29; see also Procunier v. Martinez, 416 U.S. 396, 420, 94 S.Ct. 1800, 1814–15, 40 L.Ed.2d 224 (1974). As we noted at the outset, Marion presents unique disciplinary and security considerations. This is true whether one is dealing with general population inmates or with those in the Control Unit. Because we find that the direct-access restrictions do not render Caldwell's access to the courts, as a general matter, unmeaningful, and that these restrictions are supported by legitimate security considerations, we will defer to the judgment of Marion officials in adopting the procedures they have. Procunier, 416 U.S. at 420, 94 S.Ct. at 1884; Bell v. Wolfish, 441 U.S. at 555, 99 S.Ct. at 1882; Campbell, at 226.

[27] This, however, does not fully dispose of Caldwell's access claim. Caldwell was initially convicted and sentenced under, and hence needs access to, District of Columbia law in order to pursue post-conviction remedies. He argues that the district *607 court erred in assuming that the reinstatement of the "Shawnee Plan" would, without more, remedy the lack of District of Columbia caselaw in the main law library. Under the Shawnee Plan, prisoners needing caselaw materials not available in the main law library may request, by exact cite, the materials from the Shawnee Law Library, and photocopies of these materials would be provided them. Caldwell claims, therefore, that summary judgment was improper on the basis of the affidavit submitted by Miller, and that there remain genuine issues of material fact in regard to his access claim.

We agree with Caldwell to the extent that factual issues remain as to the availability of District of Columbia caselaw materials, and as to whether there are sufficient reference and research materials available to him to obtain cites to the caselaw materials he needs.[23] If the exact-cite system is supplemented by adequate reference materials in the basic law library, then the use of a law library outside Marion to provide access to District of Columbia case materials is constitutionally permissible. If, however, the basic law library system has not been implemented, or if the libraries do not contain the materials they have been represented to contain, then the constitutionality of the legal-access program is placed into question. In either case, Caldwell would be able to pursue that part of his access claim on remand. Thus, we hold that the district court erred in granting Miller's motion for summary judgment on that part of Caldwell's claim regarding the adequacy of his access to District of Columbia caselaw. In addition, if the conditions we have noted above as to the availability of adequate reference materials in the basic law libraries are not satisfied, then Caldwell may pursue his general challenge to the adequacy of Marion's legal-access program.

[23] In Corgain v. Miller, 708 F.2d 1241 (7th Cir.1983), we held constitutionally inadequate the plan then in place at Marion for providing access to state caselaw materials. That plan required inmates to give exact cites to the materials they needed, but did not provide for the basic reference materials necessary to obtain the cites.

## E. CONFISCATION OF LEGAL AND RELIGIOUS BOOKS.

Shortly following the lockdown, prison officials at Marion confiscated all hardbound books in the possession of inmates. Apparently, the inmates were given notice only five minutes prior to the confiscations. Caldwell's personal law and religious books were taken. All inmates, including Caldwell, were told that, at the inmate's option, officials would either (1) send the confiscated books to an inmate's family, (2) donate the books to an outside organization, or (3) destroy them. Caldwell has no family to whom he could have had his books sent, nor did he wish that they be destroyed. He was not given the chance to have the books sent to friends outside Marion. Faced with the available options, Caldwell specified outside charitable organizations to which prison officials could donate the books. Approximately two months later, inmates were once again allowed to keep hardbound books in their cells.



31; Rogers, 676 F.2d at 1216 ("prisoners in the general population may, consistent with the first amendment, be denied all congregate religious services during the normal course of the operation of a prison only when paramount security interest [sic] so dictate"); Arsberry, 586 F.2d at 44; (restrictions on group religious services for inmates in disciplinary segregation permissible so long as adequate alternatives are available). Hence, it is imperative that Miller on remand introduce evidence relating to the present need for a total ban on group religious services.

In sum, neither we nor the district court have any way of determining, based on the *599 record, whether the continuing ban on group religious activities at Marion was reasonably adapted to achieving an important correctional goal. See Childs, 705 F.2d at 920; Madyun, 704 F.2d at 960. The interest in preserving order and authority in a prison is self-evident, Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 132; 97 S.Ct. 2532, 2541, 53 L.Ed.2d 627 (1977), and internal security is "central to all other correctional goals." Pell, 417 U.S. at 823, 94 S.Ct. at 2804. Nonetheless, in the absence of evidentiary support, Miller's assertion that a total ban on all group religious services is and was reasonably necessitated by security considerations is conclusory, and hence, an insufficient basis for summary judgment.

[11] On remand, Miller need not demonstrate that group religious services pose a "present danger to security and order," see Jones, 433 U.S. at 128, 97 S.Ct. at 2539; rather, he must introduce evidence that such services constitute a threat of potential violence or are disruptive of institutional security. Id. at 132, 97 S.Ct. at 2541. That evidence may take many forms. It may, for example, consist of the expert testimony of prison officials routinely responsible for exercising the discretionary authority at issue here. St. Claire, 634 F.2d at 114. As noted above, that evidence must relate not only to the circumstances surrounding the lockdown, but, more importantly, to the present state of affairs at Marion as well.

In assessing the adequacy of the evidence adduced, the district court should be particularly mindful that the lockdown, and resultant ban on group religious activities, was not precipitated by a general strike or riot, see, e.g., Walker, 771 F.2d at 930, but rather by a series of incidents involving individual inmates. It is conceivable that the passage of time, here over two-and-one-half years, has not alleviated the necessity for extraordinary security precautions. Marion is the only level-six institution in the federal penitentiary system, and we have often noted that security considerations there are unique. See, e.g., Campbell v. Miller, 787 F.2d 217, 227 (7th Cir. 1986); United States v. Silverstein, 732 F.2d 1338, 1342-43 (7th Cir. 1984), cert. denied, --- U.S. ----, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985); Garza, 688 F.2d at 482; Bono v. Saxbe, 620 F.2d 609, 611 (7th Cir. 1980). It is quite possible that the very nature of Marion and the type of inmate housed there, or other special circumstances, may call for security measures not needed in other penitentiaries, and hence, justify a permanent ban on group religious activities. See Walker, 711 F.2d at 931.

As the Supreme Court noted in Hewitt, 459 U.S. at 474, 103 S.Ct. at 872-73:

In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison ... imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 464, 101 S.Ct. 2460, 2464 [69 L.Ed.2d 158] (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

[12] Hence, we do not mean to foreclose the argument that the incidents leading up to the lockdown, although limited to a few inmates, reflected an irreversible change in the institutional character of Marion. The First Amendment requires, however, that security considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit meaningful constitutional review. Pell, 417 U.S. at 822, 94 S.Ct. at 2804. Once prison officials have satisfied this burden *600 by introducing evidence of this nature, we must defer to their judgment, unless the inmate can demonstrate that these officials have exaggerated their response to those security

*Exhibit #7*

Caldwell v. Miller, 790 F.2d 589 (1986)

to Mr. Caldwell through his cell door should not and cannot be construed as an acceptable alternative or substitute for his direct and personal participation in Mass." Miller does not challenge either the sincerity of Caldwell's beliefs or the importance of congregate religious services to the Catholic faith.[13]

[13]    At the oral argument on Miller's motion, Caldwell stated that there were no organized group religious activity of any sort at Marion, and that he was provided "the very, very barest type of communication with the Priest." When asked by the court whether the total ban on congregational services was permanent or temporary, the Assistant U.S. Attorney replied "at this time I would not be able to make that representation whether or not it's permanent."

[9]    On the basis of the affidavit submitted by Miller, it is not possible to determine whether a total ban on group religious activities is warranted by security considerations at Marion. Challenges to prison restrictions that are alleged to inhibit the First Amendment rights of inmates "must be analyzed in terms of the legitimate policies and goals of the corrections system." Pell, 417 U.S. at 822, 94 S.Ct. at 2804. It is critically important then that the record reveal the manner in which security considerations are implicated by the prohibited activity. See, e.g., Weaver v. Jago, 675 F.2d 116, 118–19 (6th Cir.1982); Reibelbis v. Marks, 675 F.2d 579, 581 (3d Cir.1982). This is not to say that an issue such as that before us now can never be *598 decided on summary judgment. See, e.g., McDonald v. Hall, 579 F.2d 120, 121 (1st Cir.1978) (inmates held in disciplinary detention); Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 864 (4th Cir.1975) (same). Rather, the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation in question and its effect on the inmate's asserted rights.[14]

[14]    Davis, the paralegal specialist at Marion, stated that the "October 28, 1983, declaration of emergency was both justified and reasonable. Staff, prior to making their decision, considered the October 22, 1983, staff murders and the October 27, 1983, staff assaults and inmate killing. Staff considered, as an overview, all the serious inmate disturbances/assaults since 1980 and particularly those incidents which have occurred since July 1983." Davis does not, however, indicate whether these incidents were connected to the security matters implicated by group religious services.

The Supreme Court has repeatedly held that routine and automatic arguments to the effect that "every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security" are inadequate to support restrictive prison regulations or policies. See, e.g., Cleavinger v. Saxner, 474 U.S. 193, ——–, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985); Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); Johnson v. Avery, 393 U.S. 483, 486–87, 89 S.Ct. 747, 749–50, 21 L.Ed.2d 718 (1969). We find that Miller's argument falls squarely within the Supreme Court's caveat.

[10]    The sole evidence offered by Miller in regard to Caldwell's free-exercise claim was Davis's affidavit. There is no indication that Davis, a paralegal specialist, possesses any degree of expertise as to matters of prison security. Nor does he state that he is responsible for making the type of discretionary decision at issue here. See St. Claire v. Cuyler, 634 F.2d 109, 115 (3rd Cir.1980). Miller submitted no further affidavits in response to Reverend Lamb's affidavit. It is true Davis averred that, following the lockdown, a Bureau task force recommended a number of changes in the operation of Marion. He did not state, however, nor do we find any conclusive mention elsewhere in the record of, the nature of those changes, whether Marion officials had adopted them, or what specific security or operational considerations support them. Davis did not even indicate whether a ban on group religious activities was recommended by the Bureau task force, or whether it grew out of the task force's other recommendations. In addition, Miller did not append a copy of the task force's findings, recommendations, or report to his motion for summary judgment. In short, Davis's affidavit offers no insight into why group religious services threaten the security or operation of Marion.

The evidence, what little there may be, offered by Miller to support the ban on group religious activities is defective for another fundamental reason: Davis's affidavit related only to the period immediately following the lockdown at Marion. Miller makes no attempt to substantiate whether the conditions that in his judgment necessitated the lockdown had persisted to the time of the oral argument on his motion for summary judgment, some nineteen months later. It is undoubtably easier to justify restrictions on group religious activities during the period immediately following a declared state of emergency, see, e.g., Walker v. Mintzes, 771 F.2d 920, 930–31 (6th Cir.1985); Rogers v. Scurr, 676 F.2d 1211, 1216 (8th Cir.1982), but it is yet another question whether security concerns warrant a permanent ban. Walker, 771 F.2d at 930–

It is far from clear what force *Cooper* should be given in a case not involving the discriminatory treatment of members of a particular faith. We also decided *Cooper* without the benefit of much of the Supreme Court jurisprudence in the area of inmate rights, most notably *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2827, 41 L.Ed.2d 495 (1974); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Cruz*, for example, the Supreme Court held that an inmate may not be "denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz*, 405 U.S. at 331, 92 S.Ct. at 1081 (emphasis added). Thus, we do not read *Cooper* as requiring that we append a "least restrictive alternative" qualifier to the standard set forth in *Madyun v. Franzen*, 704 F.2d 954 (7th Cir.), cert. denied, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983), that regulations affecting an inmate's free-exercise right be "reasonably adapted" to achieving an important penological objective.

[8] We accord, as we must, prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security, *Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 872–73, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, 441 U.S. at 547–48, 99 S.Ct. at 1878; *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806, and we will not substitute our judgment for theirs "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806; see *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hewitt*, 459 U.S. at 467, 470, 103 S.Ct. at 869–70; *Bell v. Wolfish*, 441 U.S. at 547–48, 554–55, 562–63, 99 S.Ct. at 1878–79, 1882–83, 1886–87. This does not mean, however, that it is appropriate for us to defer completely to prison administrators. *Madyun*, 704 F.2d at 959. By requiring that a prison regulation or policy be reasonably adapted to an important correctional goal, we protect the legitimate interest of *597 prisoners in adhering to their religious beliefs and give guidance to prison administrators in adopting policies that comply with constitutional standards, while at the same time appropriately deferring to their judgment in matters related to institutional security. *Id.*

The district court disposed of Caldwell's free-exercise claim on summary judgment. Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions and affidavits "show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770 (7th Cir.1986); *Box v. A & P Tea Co.*, 772 F.2d 1372 (7th Cir.1985). In addition, we must view the record and any reasonable inferences drawn from it in the light most favorable to the non-moving party. *Box*, 772 F.2d at 1375; *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985). After a thorough examination of the record, we find that there exist genuine issues of material fact concerning Caldwell's free-exercise claim, and hold that the district court's grant of summary judgment was improper.

In support of his motion for summary judgment, Miller submitted a four-page affidavit of Randy J. Davis, a paralegal specialist at Marion. Davis recited the events precipitating the lockdown, and averred to the fact that a Bureau task force was subsequently convened to "review the mission, security and operational procedures" at Marion. Davis stated further that the task force recommended that Marion retain its level-six classification, and that a number of changes in the operation of the institution be made to secure, as he puts it, "a safer environment for both the inmate population and staff." Davis also stated that "[i]ndividual television sets have been approved for each inmate in general population and once installed, funds have been appropriated to provide religious programming for each religion, if available, via the television sets." [12]

[12] As we noted earlier, we do not know what changes the task force recommended, or whether those recommendations were adopted by officials at Marion. We also do not know whether the closed-circuit television system for religious broadcasts has been installed.

In opposition to Miller's motion for summary judgment, Caldwell submitted the affidavit of Reverend West Lamb, who had been a chaplain at Marion for a period extending from before the October 28 lockdown to approximately nine months thereafter. Reverend Lamb averred to the importance of Mass, a congregational service, to Catholic life, and to the sincerity of Caldwell's religious beliefs. Reverend Lamb also stated that "the distribution of Holy Communion

*Exhibit #9*

Caldwell v. Miller, 790 F.2d 589 (1986)

right under Article III to have proceedings in their causes conducted before a district judge as opposed to a magistrate, and to ensure that the unfamiliarity of such a claimant with the judicial system does not work to deny him the exercise of that right.

Caldwell contends that the district court followed improper procedure in granting summary judgment by holding an evidentiary hearing in order to determine whether genuine issues of material fact existed as to his claims. In our opinion this inaccurately characterizes the proceedings below. It is true that the first hearing was designated a "bench trial" by the court reporter, but only the Assistant U.S. Attorney and Caldwell were present, and no witnesses were sworn or testimony taken. Rather, the magistrate asked Caldwell to outline his claims so as to "[get] an idea on the motion." The transcript comprised only twenty-eight pages. The second proceeding was designated an "evidentiary hearing." Once again, no witnesses were sworn or testimony taken. Referring to the first proceeding, the magistrate stated to Caldwell that "we previously heard arguments in this case," and informed him that an affidavit of Reverend West, one of the chaplains at Marion, had been submitted to the court. He then said to Caldwell: "I think that we have covered everything on the motion. We covered everything at the last motion hearing, didn't we?" The magistrate then took the motion for summary judgment under advisement. The entire second proceeding comprised four pages of transcript.

Caldwell was proceeding pro se and his complaint contained at best conclusory factual allegations. Moreover, Caldwell had submitted neither affidavits nor a brief in opposition to Miller's motion for summary judgment. The magistrate was giving Caldwell the opportunity to indicate what sort of evidence he would rely on should the cause go to trial. Such a procedure is entirely consonant with the practice of not holding pro se litigants to the more stringent standards applied to formally trained attorneys. See, e.g., Hughes v. Rowe, 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980) (per curiam); Haines v. Kerner, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972). To fault the manner in which the district court conducted the proceedings here would unduly inhibit a salutary practice. Thus, we will consider the proceedings below as oral argument on Miller's motion for summary judgment.

Caldwell was originally convicted in the District of Columbia. He, therefore, needs access to District of Columbia case law.

## II

[3] Before turning to the substantive issues raised by Caldwell on appeal, we must address a procedural matter. Caldwell filed his complaint under the federal mandamus acts, 28 U.S.C. §§ 1361 and 1651. The district court construed Caldwell's complaint as one seeking either a writ of habeas corpus or a writ of mandamus under these statutes. The court held that neither the mandamus statutes nor the habeas statute provided a statutory basis for federal jurisdiction over Caldwell's complaint.[9] The district court, however, after *595 concluding that it had no jurisdiction, decided the merits of Caldwell's claims by granting summary judgment for Miller. On appeal, Caldwell argues that the district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

[9] We express no opinion concerning the reasons given by the district court for holding that it had no jurisdiction over Caldwell's complaint pursuant to either 28 U.S.C. § 2254 or the mandamus provisions.

It is well settled that pro se litigants are not held to the stringent standards applied to formally trained members of the legal profession, and that, accordingly, we construe pro se complaints liberally. See, e.g., Hughes v. Rowe, 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980) (per curiam); Haines v. Kerner, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); Bates v. Jean, 745 F.2d 1146, 1150 (7th Cir.1984); Childs v. Duckworth, 705 F.2d 915, 922 (7th Cir.1983). It is also well settled that Fed.R.Civ.P. 8(a)(1) does not require a plaintiff to set forth the statutory basis for the district court's subject-matter jurisdiction in order for the court to assume jurisdiction, so long as he alleges facts sufficient to bring the case within the court's jurisdiction. Jensen v. State Board of Tax Commissioners, 763 F.2d 272, 278 (7th Cir.1985); Rohler v. TRW, Inc., 576 F.2d 1260, 1264 (7th Cir.1978); see also Loss v. Blankenship, 673 F.2d 942, 950 (7th Cir.1982) ("Imperfections in pleading style will not divest a federal court of jurisdiction where the complaint as a whole reveals a proper basis for jurisdiction.").

It is clear from the face of Caldwell's complaint that he has alleged a number of constitutional violations, arising out of the lockdown at Marion, sufficient to give the district court jurisdiction under 28 U.S.C. § 1331. See Bivens v. Six

Exhibit #10

District Court, and we apply the equal protection component of the Fifth Amendment's Due Process Clause. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

## I

Thaddeus Donald Edmonson, a construction worker, was injured in a jobsite accident at Fort Polk, Louisiana, a federal enclave. Edmonson sued Leesville Concrete Company for negligence in the United States District Court for the Western District of Louisiana, claiming that a Leesville employee permitted one of the company's trucks to roll backward and pin him against some construction equipment. **2081 Edmonson invoked his Seventh Amendment right to a trial by jury.

During voir dire, Leesville used two of its three peremptory challenges authorized by statute to remove black persons from the prospective jury. Citing our decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Edmonson, who is *617 himself black, requested that the District Court require Leesville to articulate a race-neutral explanation for striking the two jurors. The District Court denied the request on the ground that Batson does not apply in civil proceedings. As empaneled, the jury included 11 white persons and 1 black person. The jury rendered a verdict for Edmonson, assessing his total damages at $90,000. It also attributed 80% of the fault to Edmonson's contributory negligence, however, and awarded him the sum of $18,000.

Edmonson appealed, and a divided panel of the Court of Appeals for the Fifth Circuit reversed, holding that our opinion in Batson applies to a private attorney representing a private litigant and that peremptory challenges may not be used in a civil trial for the purpose of excluding jurors on the basis of race. 860 F.2d 1308 (1989). The Court of Appeals panel held that private parties become state actors when they exercise peremptory challenges and that to limit Batson to criminal cases "would betray Batson's fundamental principle [that] the state's use, toleration, and approval of peremptory challenges based on race violates the equal protection clause." Id., at 1314. The panel remanded to the trial court to consider whether Edmonson had established a prima facie case of racial discrimination under Batson.

The full court then ordered rehearing en banc. A divided en banc panel affirmed the judgment of the District Court, holding that a private litigant in a civil case can exercise peremptory challenges without accountability for alleged racial classifications. 895 F.2d 218 (1990). The court concluded that the use of peremptories by private litigants does not constitute state action and, as a result, does not implicate constitutional guarantees. The dissent reiterated the arguments of the vacated panel opinion. The Courts of Appeals have divided on the issue. See Dunham v. Frank's Nursery & Crafts, Inc., 919 F.2d 1281 (CA7 1990) (private litigant may not use peremptory challenges to exclude venirepersons on account of race); *618 Fludd v. Dykes, 863 F.2d 822 (CA11 1989) (same). Cf. Dias v. Sky Chefs, Inc., 919 F.2d 1370 (CA9 1990) (corporation may not raise a Batson-type objection in a civil trial); United States v. De Gross, 913 F.2d 1417 (CA9 1990) (government may raise a Batson-type objection in a criminal case), rehearing en banc granted, 930 F.2d 695 (1991); Reynolds v. Little Rock, 893 F.2d 1004 (CA8 1990) (when government is involved in civil litigation, it may not use its peremptory challenges in a racially discriminatory manner). We granted certiorari, 498 U.S. 809, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990), and now reverse the Court of Appeals.

## II

### A

In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), we held that a criminal defendant, regardless of his or her race, may object to a prosecutor's race-based exclusion of persons from the petit jury. Our conclusion rested on a two-part analysis. First, following our opinions in Batson and in Carter v. Jury Commission of Greene County, 396 U.S.

based upon a civil verdict may be preclusive of issues in a later case, even where some of the parties differ. See Allen v. McCurry, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). And in all jurisdictions a true verdict will be incorporated in a judgment enforceable by the court. These are traditional functions of government, not of a select, private group beyond the reach of the Constitution.

If a government confers on a private body the power to choose the government's employees or officials, the private body will be bound by the constitutional mandate of race neutrality. Cf. Tarkanian, 488 U.S., at 192-193, 109 S.Ct., at 462-463; Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). At least a plurality of the Court recognized this principle in Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). There we found state action in a scheme in which a private organization known as the Jaybird Democratic Association conducted whites-only elections to select candidates to run in the Democratic primary elections in Ford Bend County, Texas. The Jaybird candidate was certain to win the Democratic primary and the Democratic candidate was certain to win the general election. Justice Clark's concurring opinion drew from Smith v. Allwright, 321 U.S. 649, 664, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944), the principle that "any 'part of the machinery for choosing officials' becomes subject to the Constitution's constraints." Terry, supra, 345 U.S., at 481, 73 S.Ct., at 819. The concurring opinion concluded:

**2086 *626 "[W]hen a state structures its electoral apparatus in a form which devolves upon a political organization the uncontested choice of public officials, that organization itself, in whatever disguise, takes on those attributes of government which draw the Constitution's safeguards into play." 345 U.S., at 484, 73 S.Ct., at 821.

The principle that the selection of state officials, other than through election by all qualified voters, may constitute state action applies with even greater force in the context of jury selection through the use of peremptory challenges. Though the motive of a peremptory challenge may be to protect a private interest, the objective of jury selection proceedings is to determine representation on a governmental body. Were it not for peremptory challenges, there would be no question that the entire process of determining who will serve on the jury constitutes state action. The fact that the government delegates some portion of this power to private litigants does not change the governmental character of the power exercised. The delegation of authority that in Terry occurred without the aid of legislation occurs here through explicit statutory authorization.

We find respondent's reliance on Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), unavailing. In that case, we held that a public defender is not a state actor in his general representation of a criminal defendant, even though he may be in his performance of other official duties. See id., at 325, 102 S.Ct., at 453-54; Branti v. Finkel, 445 U.S. 507, 519, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980). While recognizing the employment relation between the public defender and the government, we noted that the relation is otherwise adversarial in nature. 454 U.S., at 323, n. 13, 102 S.Ct., at 452, n. 13. "[A] defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, ... a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client." Id., at 321, 102 S.Ct., at 451.

*627 In the ordinary context of civil litigation in which the government is not a party, an adversarial relation does not exist between the government and a private litigant. In the jury-selection process, the government and private litigants work for the same end. Just as a government employee was deemed a private actor because of his purpose and functions in Dodson, so here a private entity becomes a government actor for the limited purpose of using peremptories during jury selection. The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government for purposes of invoking constitutional protections against discrimination by reason of race.

Our decision in West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), provides a further illustration. We held there that a private physician who contracted with a state prison to attend to the inmates' medical needs was a state actor. He was not on a regular state payroll, but we held his "function[s] within the state system, not the precise terms

There can be no question that the first part of the Lugar inquiry is satisfied here. By their very nature, peremptory challenges have no significance outside a court of law. Their sole purpose is to permit litigants to assist the government in the selection of an impartial trier of fact. While we have recognized the value of peremptory challenges in this regard, particularly in the criminal context, see Batson, 476 U.S., at 98-99, 106 S.Ct., at 1723-1724, there is no constitutional obligation to allow them. Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988); Stilson v. United States, 250 U.S. 583, 586, 40 S.Ct. 28, 29-30, 63 L.Ed. 1154 (1919). Peremptory challenges are permitted only when the government, by statute or decisional law, deems it appropriate to allow parties to exclude a given number of persons who otherwise would satisfy the requirements for service on the petit jury.

*621 Legislative authorizations, as well as limitations, for the use of peremptory challenges date as far back as the founding of the Republic; and the common-law origins of peremptories predate that. See Holland v. Illinois, 493 U.S. 474, 481, 110 S.Ct. 803, 808, 107 L.Ed.2d 905 (1990); Swain, 380 U.S., at 212-217, 85 S.Ct., at 831-834. Today in most jurisdictions, statutes or rules make a limited number of peremptory challenges available to parties in both civil and criminal proceedings. In the case before us, the challenges were exercised under a federal statute that provides, inter alia:

> "In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly." 28 U.S.C. § 1870.

Without this authorization, granted by an Act of Congress itself, Leesville would not have been able to engage in the alleged discriminatory acts.

[3] Given that the statutory authorization for the challenges exercised in this case is clear, the remainder of our state-action analysis centers around the second part of the Lugar test, whether a private litigant in all fairness must be deemed a government actor in the use of peremptory challenges. Although we have recognized that this aspect of the analysis is often a factbound inquiry, see Lugar, supra, 457 U.S., at 939, 102 S.Ct., at 2754-55, our cases disclose certain principles of general application. Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits, see Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); whether the actor is performing a traditional governmental function, see Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); cf. San Francisco Arts & Athletics, Inc. v. United States Olympic *622 Comm., 483 U.S. 522, 544-545, 107 S.Ct. 2971, 2985-2986, 97 L.Ed.2d 427 (1987); and whether the injury caused is aggravated in a unique way by the incidents of governmental authority, see Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Based on our application of these three principles to the circumstances here, we hold that the exercise of peremptory challenges by the defendant in the District Court was pursuant to a course of state action.

[4] [5] Although private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, **2084 Tulsa Professional, 485 U.S., at 485, 108 S.Ct., at 1345, our cases have found state action when private parties make extensive use of state procedures with "the overt, significant assistance of state officials." Id., at 486, 108 S.Ct., at 1345; see Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). It cannot be disputed that, without the overt, significant participation of the government, the peremptory challenge system, as well as the jury trial system of which it is a part, simply could not exist. As discussed above, peremptory challenges have no utility outside the jury system, a system which the government alone administers. In the federal system, Congress has established the qualifications for jury service, see 28 U.S.C. § 1865, and has outlined the procedures by which jurors are selected. To this end, each district court in the federal system must adopt a plan for locating and summoning to the court eligible prospective jurors. 28 U.S.C. § 1863; see, e.g., Jury Plan for the United States District Court for the Western District of Louisiana (on file with Administrative Office of United States Courts). This plan, as with all other trial court procedures, must implement statutory policies of random juror selection from a fair cross section of the community, 28 U.S.C. §

Imam Immanuel Abu Akbar
a/k/a Samuel L. Perkins #451599
200 N. Comal St.
San Antonio, Texas 78207

SAN ANTONIO TX 782
FEB 24
2017

PURPLE HEART FOREVER USA 2014
PURPLE HEART FOREVER USA 2014

2017 FEB 27 PM 1:05

PROCESSED

FEB 23 2017

BCADC Mailroom Dept.

Inspected By:

X

39239

Fourth Court of Appeals
300 Dolorosa ste.3200
San Antonio, Texas 78205

7820533099 C011